UNITED STATES of America, Plaintiff,

v.

Allan A. MUSSARI, Defendant.

No. CR 95–009 PHX PGR.

United States District Court,
D. Arizona.

July 26, 1995.

Michael Joseph Bidwell, U.S. Atty., Phoenix, AZ, for plaintiff.

David Lee Titterington, Federal Public Defender, Phoenix, AZ, for defendant.

## ORDER

ROSENBLATT, District Judge.

### I. BACKGROUND

Allan Mussari ("Defendant") was indicted on January 11, 1995 on one count of Failure to Pay Child Support Obligation in violation of 18 U.S.C. § 228, the Child Support Recovery Act of 1992 ("CSRA").[1] The complaint alleges that the Arizona Superior Court in and for Maricopa County, by an order dated October 7, 1988, ordered Defendant to pay $752.00 per month in child support to his ex-wife for the benefit of their children.[2] The complaint further alleges that Defendant lives in Illinois, his children live in Arizona, and that he is approximately $40,385.00 in arrears on his child support payments. The complaint also alleges that Defendant was ordered to appear before the Arizona Superior Court in and for Maricopa County on April 28, 1993, and Defendant failed to appear. As a result, that court entered judgment against Defendant for child support arrearages in the amount of $37,558.00.

On March 13, 1995, Defendant filed a Motion to Dismiss Indictment (Unconstitutional Statute) ("Motion") with this court, contending that 18 U.S.C. § 228 is an unconstitutional exercise of Congressional power. Subsequent to the filing of the motion by the Defendant, the United States Supreme Court issued its decision in *United States v. Lopez,* — U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), which held the Federal Gun–Free School Zone Act, 18 U.S.C. § 922(q), to be unconstitutional. Because the *Lopez* decision is directly relevant to the question pending before this court, the parties were given additional time in which to supplement their arguments in order to discuss the *Lopez* decision.

This court heard oral arguments on the motion on May 8, 1995. The court now having considered oral arguments and the briefs filed by the parties in relation to this matter and the *Lopez* decision, the court finds that 18 U.S.C. § 228 is an unconstitutional exercise of Congress' power, and therefore Defendant's Motion to Dismiss Indictment should be granted.

### II. DISCUSSION

#### A. Presumption of constitutionality

 In determining whether a statute enacted by Congress is constitutional, the

1. The text of the Child Support Recovery Act of 1992 states:
 (a) **Offense.**—Whoever willfully fails to pay a past due support obligation with respect to a child who resides in another State shall be punished as provided in subsection (b).
 (b) **Punishment.**—The punishment for an offense under this section is—
 (1) in the case of a first offense under this section, a fine under this title, imprisonment for not more than 6 months, or both; and
 (2) in any other case, a fine under this title, imprisonment for not more than 2 years, or both.
 (c) **Restitution.**—As used in this section—
 (1) the term "past due support obligation" means any amount—
 (A) determined under a court order or an order of an administrative process pursuant to the law of a State to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living; and
 (B) that has remained unpaid for a period longer than one year, or is greater than $5,000; and
 (2) the term "State" includes the District of Columbia, and any other possession or territory of the United States.
 18 U.S.C. § 228.

2. Defendant was subsequently granted a modification of the amount of child support by the Arizona Superior Court in and for Maricopa County on January 1, 1993. Defendant's payments were reduced to $256.00 per month.

court must presume that the statute is constitutional. *See Walters v. National Ass'n of Radiation Survivors,* 468 U.S. 1323, 105 S.Ct. 11, 82 L.Ed.2d 908 (1984). However, the presumption of constitutionality is not unlimited.

The canon of construction that a court should strive to interpret a statute in a way that will avoid an unconstitutional construction is useful in close cases, but it is " 'not a license for the judiciary to rewrite language enacted by the legislature.' " *Chapman v. U.S.,* 500 U.S. 453, 464, 111 S.Ct. 1919, 1927, 114 L.Ed.2d 524 (1991) (quoting *United States v. Monsanto,* 491 U.S. 600, 611, 109 S.Ct. 2657, 2664, 105 L.Ed.2d 512 (1989)).

In interpreting 18 U.S.C. § 228, this court is focusing on whether Congress had the authority to enact the legislation under the powers given to Congress by the Constitution. Because the court has found that the CSRA is an unconstitutional exercise of Congressional power, *see* Discussion, *infra,* the court need not attempt to construe the statute in a manner which would be constitutional.

### B. Commerce Clause

■ The Commerce Clause empowers Congress "[t]o regulate Commerce with foreign Nations and among the several States, and with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3. The Supreme Court has recently revisited the breadth of the power given to Congress by the Commerce Clause in enacting legislation. In *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court struck down the Gun–Free School Zones Act of 1990 as unconstitutional. The Supreme Court undertook an extensive analysis of the history of the Commerce Clause during the course of the *Lopez* decision. The Supreme Court began its analysis with the early cases which defined the extent of the Commerce Clause power as stated in *Gibbons v. Ogden,* 9 Wheat. 1, 189–190, 6 L.Ed. 23 (1824), and then continued the analysis with the string of cases spanning nearly a century which dealt with the Commerce Clause more as a limitation on state legislation that discriminated against interstate commerce, including *Veazie v. Moor,* 14 How. 568, 573–575, 14 L.Ed. 545 (1852) and *Kidd v. Pearson,* 128 U.S. 1, 17, 20–22, 9 S.Ct. 6, 8, 9–10, 32 L.Ed. 346 (1888). *Lopez,* —— U.S. at ——, 115 S.Ct. at 1627.

The Supreme Court then expanded the defined authority of Congress contained in the Commerce Clause. Cases such as *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (upholding the National Labor Relations Act against a Commerce Clause challenge) and *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (holding that the Commerce Clause reached the growing of wheat which was entirely consumed by the grower) stated a new view of the expansive reach of the Commerce Clause. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1628. The Supreme Court then recognized the most recent set of cases to define the Commerce Clause power, including *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) and *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), and the "rational basis" [3] test to be employed in the determination of the constitutionality of legislation passed under the guise of the Commerce Clause. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629.

After acknowledging the extensive evolution of the meaning of the Commerce Clause, as discussed *supra,* the Supreme Court incorporated the various tests employed throughout the history of the Commerce Clause, and announced a three-part standard applicable to determine whether a federal statute is constitutional under the Commerce Clause today:

First, Congress may regulate the use of the channels of interstate commerce.... Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the activity sufficiently affected interstate commerce. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1629.

---

**3.** The rational basis test stated that a rational basis had to exist for concluding that a regulated

threat may come only from intrastate activities.... Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce ... i.e., those activities that substantially affect interstate commerce.

*Lopez,* —— U.S. at ———— ——, 115 S.Ct. at 1629–30.

The Supreme Court then applied the test to the Gun–Free School Zones Act of 1990, which criminalized the knowing possession of a firearm in a school zone. Finding that this statute would only fit under the third category of legislation allowed by the Commerce Clause, the Supreme Court found that this statute was a criminal statute which had nothing to do with commerce and which had no jurisdictional element which would establish a nexus with interstate commerce. *Id.* at ——, ———— ——, 115 S.Ct. at 1630; 1630–31. The Supreme Court found that because the statute did not "substantially affect interstate commerce", it went beyond the scope of the Commerce Clause and was an unconstitutional exercise of Congress' legislative power. *See, Lopez,* cited *supra.*

In applying the principles espoused in the *Lopez* decision to the facts of this case, the court must first determine under which category of activity that Congress may regulate pursuant to the Commerce Clause, if any, the CSRA falls. Clearly criminalizing the failure to pay child support would not qualify as the regulation of the use of the channels of interstate commerce, nor would it qualify as the regulation of the instrumentalities of interstate commerce. Therefore, if the CSRA is to be upheld, it would have to be as a regulation of activities having a "substantial relation to interstate commerce".

### 1. Criminal nature of the CSRA

▮ This court cannot find that the CSRA bears a substantial relation to interstate commerce. First, this is a criminal

statute aimed at punishing parents delinquent in their child support payments. Under our federal system, the " 'States possess primary authority for defining and enforcing the criminal law.' " *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1720, 123 L.Ed.2d 353 (1993) (quoting *Engle v. Isaac,* 456 U.S. 107, 128, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982); *see also Screws v. United States,* 325 U.S. 91, 109, 65 S.Ct. 1031, 1039, 89 L.Ed. 1495 (1945). When Congress criminalizes conduct already denounced as criminal by the States, it effects a " 'change in the sensitive relation between federal and state criminal jurisdiction.' " *United States v. Enmons,* 410 U.S. 396, 411–412, 93 S.Ct. 1007, 1015–16, 35 L.Ed.2d 379 (1973) (quoting *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971)).

Numerous states have criminal provisions related to the failure of a parent to furnish support to a child.[4] In addition, forty-eight states have passed the Uniform Reciprocal Enforcement of Support Act ("URESA"), a civil act designed to address the extradition of defendants who have failed to pay child support in the extraditing state. *See* H.R.Rep. No. 771, 102d Cong., 2d Sess. 5 (1992), at 5. Considering the amount of State legislation in this area, it is clear that the States which have enacted legislation have contemplated the pros and cons related to enacting criminal and civil legislation in response to the problem of failure to pay child support. To allow Congress to pass a national criminal statute addressing this area would allow Congress to usurp the authority of those States which have chosen specifically not to criminalize the failure to pay child support payments, for whatever reasons.

Further, just as the Supreme Court stated in the *Lopez* decision, the CSRA is a "criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms." *Lopez,* —— U.S. at —— ——, 115 S.Ct. at 1630–31. Clearly there is

---

4. *See, e.g.,* Alaska Stat. § 11.51.120 (1994); Ariz. Rev.Stat.Ann. § 12–2458 (1994); Idaho Code § 18–401 (1995); Cal.Penal Code § 270 (West 1995); Or.Rev.Stat. § 163.555 (1993); Mont. Code Ann. § 45–5–621 (1993); Wis.Stat.Ann. § 948.22 (1995); La.Rev.Stat.Ann. § 14:74 (West 1986); Tex.Penal Code Ann. § 25.05 (West 1993); Ohio Rev.Code Ann. § 2919.21 (Baldwin 1986); Conn.Gen.Stat.Ann. § 53–304 (West 1994); Kan.Stat.Ann. § 21–3605 (1993); Fla. Stat.Ann. § 856.04 (West 1994).

no nexus between this criminal statute and interstate commerce.[5]

Therefore, the fact that this statute is a criminal statute aimed at an area of activity which has already been addressed by the States supports this court's finding that the CSRA is not substantially related to interstate commerce, and thus is unconstitutional.

### 2. Interstate link

Plaintiff's arguments in support of the CSRA do not provide the link between this statute and interstate commerce sufficient to show that the CSRA is substantially related to interstate commerce. Plaintiff claims that there is an interstate nexus because the delinquent parent and the child must live in different states. Further, Plaintiff claims that because the non-payment of child support substantially affects federal monies, i.e. federal monies support families, etc., Congress has the authority to enact legislation which criminalizes the failure to pay child support.[6]

The CSRA's requirement that the delinquent parent and the child live in different states does not establish that this statute is substantially related to interstate commerce. Plaintiff claims the CSRA is directed at "those parental obligors who *deliberately moved interstate* to avoid payment." *See* Response to Defendant's Motion to Dismiss Indictment Because of Unconstitutionality of the Underlying Statute ("Response"), pg. 4 (emphasis added). Further, the CSRA's legislative history specifically states that the purpose of the CSRA is to "impose a criminal penalty for *flight* to avoid payment of arrearages in child support...." *See* H.R.Rep. No. 771, at 5. However, the statute is clearly not tailored to address only those parents who specifically flee from a state in order to avoid paying child support. There is no intent to flee requirement related to the parent required to pay child support. The statute applies to any parent who lives in a state different from the child and who has failed to pay child support in the amounts required by the statute. Further, the statute does not address the situation when the custodial parent moves out of state, and the parent obligated to pay child support does not move at all. The statute would still apply to this parent if the parent is in arrears, despite the "flight" of the custodial parent to another state.

Additionally, a finding that because parent and child live in different states establishes the necessary interstate nexus for Commerce Clause authority would in essence give Congress carte blanche to regulate any area it deemed appropriate, even if such area was traditionally one regulated by the States, i.e. marriage, divorce, child custody, etc. The Supreme Court has similarly rejected such a finding of unlimited Congressional power based upon such tenuous arguments:

> We pause to consider the implications of the Government's arguments. The Government admits, under its "costs of crime" reasoning, that Congress could regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce. See Tr. of Oral Arg. 8–9. Similarly, under the Government's "national productivity" reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. *Thus, if we were to accept the Government's arguments, we are hard-pressed to posit any activity by an individual that Congress is without power to regulate.*

*Lopez,* —— U.S. at ——, 115 S.Ct. at 1632 (emphasis added).

 The interstate nexus contained in the CSRA does not establish its substantial relation to interstate commerce. The nexus of

---

5. Whether this statute relates to commerce will be further discussed, *infra,* in the context of legislative history.

6. The argument related to expenditure of federal monies will be addressed in the section entitled *Federal monies, infra.*

requiring the non-paying parent and the child to live in different states goes beyond those cases the CSRA was aimed to address, namely parents who flee a state in an attempt to avoid child support payment. Additionally, to allow the purported interstate nexus in the CSRA to establish the substantial relation to interstate commerce would result in unlimited Congressional power to regulate even those areas traditionally left for the States to govern. Further, as will be discussed *infra*, a showing that a statute contains an interstate *nexus* is insufficient to establish that the statute substantially relates to interstate *commerce*. Thus, the CSRA again fails to establish the requisite relation to interstate commerce.

### 3. Federal monies

Plaintiff next contends that Congress had the power under the Commerce Clause to enact the CSRA because the failure of parents to make support payments affects the federal coffers. Both parties have provided evidence that Congress has addressed the failure to pay child support via civil legislation. For example, Congress has predicated receipt by the States of federal grant money on the passage of legislation aimed at recovering child support from delinquent parents who are obligated to make support payments. *See* H.R.Rep. No. 771, at 5. There is no dispute between the parties that legislation of this type is a constitutional exercise of Congressional power with respect to the States.[7] Plaintiff contends that the CSRA is a statute which also falls under this power of Congress because there is a provision related to the CSRA which provides for grant money to States which enact criminal legislation related to the failure to pay child support. Plaintiff further contends that it is very difficult for the States to enforce any criminal statutes they enact due to the difficulties associated with extradition, and therefore federal criminal legislation is necessary. *See* Response, pp. 3–4.

However, Plaintiff's argument regarding the necessity of *criminal* legislation to redress activities which arguably affect federal monies is insufficient to establish that delinquent child support payments substantially affect interstate commerce. First, the CSRA's legislative history shows that the civil legislation implemented in order to collect delinquent child support is effective. The legislative history reveals the following:

For example, in 1988, 6.4 million children from homes in which the father was absent were enrolled in the program of Aid to Families with Dependent Children ("AFDC"), and that number has steadily increased since that time. Recognizing this problem, congress moved with the Social Services Amendments of 1974 to establish a Federal-state partnership for the collection of child support. This program has grown tremendously from its inception, with collections rising from $512 million in 1976 to $4.6 billion in 1988, a real increase of 328 percent in FY 1988 dollars. Realizing the potential for even greater collections for both AFDC and non-AFDC families, Congress strengthened and expanded the tools available to the state collection programs in the Child Support Enforcement Amendments of 1984 and the Family Support Act of 1988. These enactments have made possible increased collections by a number of means, including Federal tax refund offsets, state tax refund offsets, unemployment compensation intercepts and direct wage withholding.

*See* H.R.Rep. No. 771, at 5.

As stated *supra*, both parties acknowledge that Congressional legislation of this type, i.e. conditioning grants, tax breaks, etc. on the passage of legislation by the States in order to address the problem, is constitutional. Because the civil legislation is redressing the concerns claimed to be the basis for the necessity of the CSRA, Plaintiff has failed to show that the CSRA, a criminal statute, is substantially related to interstate commerce.[8]

---

**7.** For a discussion related to the constitutionality of such legislation, *see New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

**8.** The provisions related to the grant of federal monies in relation to the passage of criminal legislation in the States is not actually part of the text of the CSRA, but is found at 42 U.S.C. § 3796cc, *et seq.*. Because the provisions related

Additionally, the argument that extradition from one state to another warrants federal criminal legislation fails to show the requisite relation to interstate commerce. Extradition among the States occurs on a daily basis in relation to other crimes; there is no evidence that extradition in relation to child support enforcement provisions somehow cannot be accomplished via traditional extradition methods. Were this court to accept the representations of Plaintiff in relation to the difficulties of extradition, Congress would again have carte blanche to criminalize any and all activities in order to ensure that one State's laws were enforced. As stated *supra*, a finding of such unlimited authority has been rejected by the Supreme Court, and will certainly not be upheld by this court in relation to the CSRA.

Although Congress' attempts to encourage State criminal legislation in relation to child support collection is constitutional insofar as Congress conditioning federal grant money on such State legislation, such a constitutional exercise of power does not legitimize the attempts of Congress to pass federal criminal legislation in this same area. The arguments in relation to the federal monies involved in the enforcement of child support obligations does not establish the necessary relation to interstate commerce, and again the CSRA must fail as unconstitutional.

#### 4. Legislative history

Finally, just as in the *Lopez* decision, there is no specific legislative history which would support that the CSRA is aimed at interstate *commerce*. Contained in the legislative history of the CSRA is the following statement:

EFFECT OF FEDERAL CRIMINAL INTERSTATE CHILD SUPPORT EN-FORCEMENT

H.R. 1241 [18 U.S.C. § 228] addresses the problem of interstate enforcement of child support by taking the incentive out of moving interstate to avoid payment. The bill is designed to target interstate cases only. These are the cases which state officials report to be clearly the most diffi-

cult to enforce, especially the "hard core" group of parents who flagrantly refuse to pay and whom traditional extradition procedures have utterly failed to bring to justice. The Committee believes that a child should be able to expect the most basic support from those chose to bring the child into the world. That expectation should not end at the state line. The Committee further believes that the taxpayers of America should be able to expect that the burden of caring for these children will be placed on the shoulders of the parents—where it rightfully belongs.

*See* H.R.Rep. No. 771, at 5.

This legislative history evidences a consideration by Congress of the need for an interstate nexus when enacting this legislation; however, more is needed. There must be a substantial effect on interstate *commerce*. "Commerce" was defined by the Supreme Court in the *Lopez* decision:

"Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse."

*Lopez,* —— U.S. at ——, 115 S.Ct. at 1627 (quoting *Gibbons v. Ogden,* 9 Wheat 1, 189–190, 6 L.Ed. 23 (1824)).

Just as there was no evidence in the *Lopez* decision that the proscribed activity, i.e. possession of a firearm within a school zone, involved interstate commerce, neither is there evidence that the CSRA involves interstate commerce. There is no commercial intercourse involved in the collection of delinquent child support payments. If the collection of debt were sufficient to warrant federal criminal intervention, Congress would be able to legislate in virtually any area. Even the collection of alimony payments could be subject to Congressional scrutiny, despite the States' traditional role as overseeing matters related to divorce and marriage. Again, this potential for unlimited Congressional authority, coupled with the absence of a showing

---

to the grant monies are not actually part of the CSRA, this Court can find the CSRA unconstitutional and the grant provisions constitutional

without having to address severance of the provisions.

that the failure to pay child support affects interstate commerce, supports this court's finding that the CSRA is unconstitutional.

### C. Federalism and comity

█ Principles of federalism and comity also support this court's finding that the CSRA is unconstitutional. As discussed *supra*, the areas of criminal law and child custody are traditionally delegated to the States for regulation.

[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance. Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States. This congressional policy is rooted in the same concepts of American federalism that have provided the basis for judge-made doctrines.... As this Court emphasized only last Term in *Rewis v. United States*, [401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971)], we will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction. In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.

*United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971) (citations and footnotes omitted).

Further, actual application of the CSRA would force federal courts to review and apply orders of state courts in violation of principles of federalism and comity. A defendant being prosecuted under the CSRA could arguably defend the action by challenging the validity of the underlying state court support order. Either the federal court would be forced to review the support order, or stay the pending federal criminal case while the support order is collaterally attacked in state court. Neither of these scenarios is desirable in light of the principles of comity and the speedy trial provisions federal courts are bound by in criminal matters.

Based upon these considerations of federalism and comity, the court finds further support for its holding that the CSRA is unconstitutional.

### D. Tenth Amendment

█ Defendant also claims that the CSRA violates the Tenth Amendment to the Constitution because Congress was acting outside those powers given it by the Constitution. The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively." U.S. Const. amend. X. This provision shows the intent of the Framers of the Constitution that the States retain substantial sovereign authority under our constitutional system. James Madison stated:

"The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.... The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." The Federalist No. 45, pp. 292–293 (C. Rossiter ed. 1961) (J. Madison).

*Gregory v. Ashcroft*, 501 U.S. 452, 458, 111 S.Ct. 2395, 2399, 115 L.Ed.2d 410 (1991).

█ Because the powers given to Congress are defined in the Constitution, Congress must act pursuant to those powers in enacting legislation. If Congress does not act pursuant to one of the enumerated powers given to it by the Constitution, it is infringing upon those powers which are reserved to the States by the Tenth Amendment. "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States." *Id.* at 460, 111 S.Ct. at 2400.

As discussed *supra*, Congress is not acting pursuant to those powers given it under the Constitution. The CSRA is not a valid exercise of power under the Commerce Clause or any other provision of the Constitution grant-

ing Congress power.[9] Because Congress is acting outside its authority, it is infringing upon those powers specifically reserved for the States under the Tenth Amendment. Clearly the CSRA is an attempt to affect the "lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State", and as James Madison stated, such regulation is within the purview of the States.

Because the CSRA is an exercise of powers beyond those given to Congress by the Constitution, the CSRA infringes upon those powers reserved for the States by the Tenth Amendment. Therefore, the CSRA is also an unconstitutional exercise of Congressional power in violation of the Tenth Amendment.

### III. *CONCLUSION*

This court must presume that legislation enacted by Congress is constitutional. Even making this presumption, the court finds that the CSRA is an unconstitutional exercise of Congressional power under the Commerce Clause. Utilizing the analysis in the *Lopez* decision, the CSRA is not substantially related to interstate commerce, and therefore is beyond the scope of Congressional power under the Commerce Clause.

Further, principles of federalism and comity require this court to find the CSRA unconstitutional. To allow such legislation to remain in effect would result in federal courts interpreting state court child support orders. Additionally, it would encroach upon the States' ability to legislate in areas traditionally regulated by the States.

Finally, the CSRA is an unconstitutional encroachment of State's rights as provided in the Tenth Amendment to the United States Constitution. The CSRA is beyond the powers given to Congress by the Constitution, and thus it infringes upon those powers reserved to the States.

Based upon the foregoing discussion, the court finds that the CSRA is unconstitutional, and Defendant's Motion to Dismiss Indictment must be granted.

IT IS THEREFORE ORDERED granting Defendant's Motion to Dismiss Indictment (Unconstitutional Statute) [Doc. # 21].

---

9. The parties do not argue that Congress could enact this legislation pursuant to any other provision of the Constitution, nor could such an argument be validly made.