**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 94-30714

ACORN, ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW;
ILLENE SIPPIO, Individually and as tutrix
of her minor daughters, Terri Sippio and Torey Sippio;
FRANK CROSBY, Individually and as tutor of his minor son,
Devin Crosby,

Plaintiffs-Appellees,

VERSUS

EDWIN EDWARDS, In his official capacity
as Governor of Louisiana; J. CHRISTOPHER PILLEY,
In his official capacity as Secretary of the
Louisiana Department of Health and Hospitals;
T. JAY RAY, In his official capacity as Administrator
of the Safe Drinking Water Program, Louisiana
Department of Health and Hospitals, Office of Public Health,

Defendants-Appellants.

Appeals from the United States District Court
for the Eastern District of Louisiana

April 22, 1996

Before GARWOOD, DUHÉ, and PARKER, Circuit Judges.

DUHÉ, Circuit Judge:

A public interest group and two concerned parents sued Louisiana state executive officials, in their official capacities, to force the State into compliance with the Lead Contamination Control Act of 1988, Pub. L. No. 100-572, 102 Stat. 2884 (codified in relevant part at 42 U.S.C. §§ 300j-21 to 300j-26). After the suit was dismissed as moot, the Plaintiffs successfully moved for

attorney's fees.  The Defendant state officials appealed the award. Because we agree that the Plaintiffs failed to allege a violation of a lawful requirement of the Act, and thus no basis for an award of attorney's fees exists, we reverse and render judgment dismissing the claim for attorney's fees.

## I. The Lead Contamination Control Act of 1988

In response to concerns that the nation's children were being exposed to unsafe levels of lead in their drinking water, Congress passed the Lead Contamination Control Act of 1988 ("LCCA").  H.R. Rep. No. 1041, 100th Cong., 2d Sess. at 6-8 (1988), reprinted in 1988 U.S.C.C.A.N. 3793, 3793-95.  The LCCA amended the Safe Drinking Water Act ("SDWA") to target what Congress perceived was a significant source of such lead contamination--electric drinking water coolers containing lead solder or lead-lined water tanks located in schools.  Id. at 7, reprinted in 1988 U.S.C.C.A.N. at 3794-95.  Under the LCCA, the Administrator of the Environmental Protection Agency and the States share responsibility for remedying this problem.

The Administrator is required to identify each brand and model of drinking water cooler which is not lead free, including each brand and model that has a lead-lined tank.  42 U.S.C. § 300j-23(a).  A list of the identified drinking water coolers must then be published, subject to the Administrator's continuing duty to update the list as new information becomes available.[1]  Id.  The

---

[1]  All drinking water coolers identified on this list as having a lead-lined tank are considered to be imminently hazardous under the Consumer Product Safety Act, 15 U.S.C. § 2051 et seq., and the

Administrator is also required to distribute to the States the list of non-lead free drinking water coolers, as well as to publish a guidance document and testing protocol aimed at helping local educational agencies, schools, and day care centers determine the source and degree of lead contamination in their drinking water systems and remedy such contamination. 42 U.S.C. § 300j-24(a)-(b).

The States' responsibilities under the LCCA stem from only two provisions. Section 300j-24(c) provides that "[e]ach State shall provide for the dissemination to local educational agencies, private nonprofit elementary or secondary schools and to day care centers of the guidance document and testing protocol published [by the Administrator], together with the list of drinking water coolers published under section 300j-23(a) of this title." 42 U.S.C. § 300j-24(c). Further, § 300j-24(d) requires States to establish remedial action programs for the removal of lead contaminants from school drinking water systems. More particularly, this section states:

> (d) Remedial action program
>
>> (1) Testing and removing lead contamination
>>
>> Within 9 months after October 31, 1988, each State shall establish a program, consistent with this section, to assist local educational agencies in testing for, and remedying, lead contamination in drinking water from coolers and from other sources of lead contamination at

_____

manufacturer and importer of such coolers is required to repair, replace, or recall and provide a refund for the coolers by a date specified in the LCCA. 42 U.S.C. § 300j-22. Additionally, the LCCA provides criminal and civil penalties for any person who sells in interstate commerce, or manufactures for sale in interstate commerce, any drinking water cooler listed, or any other drinking water cooler that is not lead free. 42 U.S.C. § 300j-23(b)-(d).

schools under the jurisdiction of such agencies.

\* \* \*

(3) Coolers

In the case of drinking water coolers, such program shall include measures for the reduction or elimination of lead contamination from those water coolers which are located in schools. Such measures shall be adequate to ensure that within 15 months after October 31, 1988, all such water coolers in schools under the jurisdiction of such agencies are repaired, replaced, permanently removed, or rendered inoperable unless the cooler is tested and found (within the limits of testing accuracy) not to contribute lead to drinking water.

Section 300j-25 provides that the Administrator shall make grants to the States to assist them in complying with these mandates.[2]

Finally, § 300j-8 of the SDWA provides a mechanism by which "any person may commence a civil action on his own behalf" to force the Administrator and the States to carry out the mandates of the LCCA.

## II. Procedural Background

Pursuant to the citizen's suit provision of the SDWA (42 U.S.C. § 300j-8), the Association of Community Organizations for Reform Now ("ACORN")[3] sent a "Notice of Intent to File Suit" letter to Louisiana's Governor; its Secretary of the Department of Health

---

[2] Section 300j-25(a) mandates that the Administrator "shall make grants to States to establish and carry out State programs under section 300j-24." Section 300j-25(c) authorizes Congress to appropriate $30,000,000 for each fiscal year from 1989 to 1991 to fund the Administrator's efforts. No such appropriations, however, have been made by Congress, and the Administrator has not awarded any grants to the States pursuant to its authorization.

[3] The letter was sent by the Sierra Club Legal Defense Fund, Inc., on behalf of ACORN and "the children of Frank and Sheryl Crosby, the children of Illene D. Sippio, and a class of all other similarly situated children in Louisiana."

and Hospitals; and the Administrator of the Safe Drinking Water Program of the Louisiana Department of Health and Hospitals. Therein, ACORN alleged violations of § 300j-24(c) (failure to disseminate the EPA list of non-lead free drinking water coolers) and § 300j-24(d)[4] (failure to establish a remedial action program). After receiving this letter, the Department of Health and Hospitals distributed to local educational agencies, schools, and day care centers an EPA Fact Sheet that listed non-lead free drinking water coolers identified as of February 1990.

Thereafter, ACORN[5] sued these officials in their official capacities (hereinafter "Defendants"), alleging only that Defendants had failed to establish a remedial action program as required by § 300j-24(d), and seeking declaratory and injunctive relief. After concluding that distribution of the EPA Fact Sheet instead of the final list of non-lead free drinking water coolers

---

[4] ACORN's letter, in fact, alleged violation of subsections (d)(1) and (d)(3) only. Accordingly, to simplify our task, we will refer to these two subsections collectively as § 300j-24(d). Subsection (d)(2), which is not at issue and thus is excluded from our discussion and conclusions, provides:

> A copy of the results of any testing under paragraph (1) shall be available in the administrative offices of the local educational agency for inspection by the public, including teachers, other school personnel, and parents. The local educational agency shall notify parent, teacher, and employee organizations of the availability of such testing results.

[5] Suit was actually filed on behalf of ACORN, Illene Sippio, individually and as the natural tutrix of her minor daughters, and Frank Crosby, individually and as the natural tutor of his minor son. Sippio and Crosby are parents of children attending schools that did not receive the EPA list timely and that employ drinking water coolers contained on the list. For simplicity, these plaintiffs will be referred to throughout the opinion collectively as "ACORN."

published by the EPA in the January 18, 1990 Federal Register did not satisfy § 300j-24(c), ACORN amended its complaint to add a cause of action for violation of this provision of the LCCA.

Defendants moved for dismissal for lack of subject matter jurisdiction or, alternatively, summary judgment. Defendants claimed that ACORN did not give the notice required under § 300j-8(b)(1) and that ACORN, the organization, lacked standing. The district court denied Defendants' motion.[6] ACORN v. Edwards, 842 F. Supp. 227 (E.D. La. 1993). Thereafter, Defendants answered ACORN's complaint reasserting inadequate notice and lack of subject matter jurisdiction, and alleging that ACORN's claims were barred by the Eleventh Amendment, that ACORN failed to join certain indispensable parties--i.e., the EPA and local educational agencies, and that the provisions of the LCCA at issue are unconstitutional. Defendants filed a Motion to Certify Constitutional Questions to the Attorney General of the United States.

ACORN moved for summary judgment on the issue that Defendants were in violation of § 300j-24(d)(3). Defendants then filed their own summary judgment motion seeking dismissal of all claims, or alternatively the claims of the individual plaintiffs and the § 300j-24(c) claim. The district court denied ACORN's summary judgment motion and Defendants' motion to certify the constitutional questions. Later, however, the district court,

---

[6]   The district court also denied Defendants' motion seeking reconsideration. ACORN, 842 F. Supp. at 235.

6

after a telephone status conference with all parties, granted Defendants' motion for summary judgment and dismissed all claims as moot.[7]  The district court's ruling specifically reserved the parties' rights to litigate whether attorney's fees may be due.

ACORN then moved for an award of attorney's fees and other expenses pursuant to § 300j-8(d).[8]  Defendants opposed this motion on numerous grounds; most notably that the provisions of the LCCA sought to be enforced are unconstitutional.  The district court reaffirmed that all claims in this suit were dismissed as moot and ordered Defendants to pay attorney's fees and expenses of $41,181.25 to ACORN for payment by it in the same amount to its attorneys.  Defendants timely appealed.

### III. Discussion

[7]  The record indicates that ACORN submitted to Defendants a motion to dismiss under Federal Rule of Civil Procedure 41(a)(2) believing that the State was now complying with the LCCA.  Defendants declined to consent to the dismissal.  After the telephone status conference, during which ACORN expressed a desire to redirect its resources from litigation to monitoring the LCCA program, Defendants filed the summary judgment motion that was granted.

The district court, in its Memorandum Opinion and Order of November 14, 1994, recognized that ACORN's claims were mooted by the State's compliance with §§ 300j-24(c) and (d).  On February 21, 1994, the State distributed the January 1990 Federal Register list.  Further, during the pendency of this litigation, the State completed inspection of all of the suspect drinking water coolers located in participating schools in accordance with the State's remedial action plan--i.e., Louisiana's Implementation of the federal Lead Contamination Control Act of 1988.  The cover page of this plan indicates it was produced by the State's LCCA Program Director in 1989.

[8]  Section 300j-8(d) provides that "[t]he court, in issuing any final order in any action brought under [300j-8](a), may award costs of litigation (including reasonable attorney and expert witness fees) to any party whenever the court determines such an award is appropriate."

7

On appeal, Defendants raise numerous alleged errors attacking the district court's award of attorney's fees. After wading through this morass, we elect to resolve Defendants' claims as follows.

## A. 42 U.S.C. § 300j-24(c)

Defendants challenge both § 300j-24(c) and § 300j-24(d) as violative of the United States Constitution--in particular, the Tenth Amendment. We are mindful, however, that "[federal courts] have [a] . . . duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration." County Court of Ulster County v. Allen, 442 U.S. 140, 154 (1979). See also Ysleta Del Sur Pueblo v. Texas, 36 F.3d 1325, 1332 (5th Cir. 1994), certs. denied, __ U.S. __, __, 115 S.Ct. 1358, 1358 (1995); Louisiana v. Public Investors, Inc., 35 F.3d 216, 219-20 (5th Cir. 1994).

ACORN's original complaint alleged only that the State was in violation of § 300j-24(d). ACORN explained to the district court that, at the time suit was filed, it was not sure whether Defendants' earlier dissemination of the EPA Fact Sheet, in lieu of the list published by the EPA in the January 18, 1990 Federal Register, constituted compliance with § 300j-24(c). ACORN, 842 F. Supp. at 228 n.2. After deciding that it did not, ACORN amended its complaint to allege a violation of § 300j-24(c). Some nine months after suit commenced, Defendants disseminated the Federal Register list.

Defendants contend they fully complied with § 300j-24(c) prior

8

to ACORN's institution of suit by distributing to the proper entities the February 1990 EPA Fact Sheet.[9]  Accordingly, Defendants argue they were not in violation of this requirement of the LCCA at the time suit was commenced, and therefore cannot be liable for attorney's fees incurred in pressing a claim to the contrary.

ACORN argues that "publish" in §§ 300j-23(a) and -24(c) requires publication in the Federal Register.  Impliedly, the district court agreed.  ACORN, 842 F. Supp. at 229, 235 n.26. Because the Fact Sheet was not so published, ACORN contends, Defendants did not comply with § 300j-24(c) until over nine months after suit was filed, when they finally disseminated the EPA "final list" of non-lead free drinking water coolers contained in the January 18, 1990 Federal Register.  As such, ACORN continues, the lawsuit was the catalyst for Defendants' compliance, and thus ACORN is entitled to the fees it incurred in pursuing this claim.

Section 300j-24(c) provides:

> Each State shall provide for the dissemination to local educational agencies, private nonprofit elementary or secondary schools and to day care centers of the guidance document and testing protocol published under subsection (b) of this section, together with the list of drinking water coolers published under section 300j-23(a) of this title.

---

[9]  A comparison of the EPA Fact Sheet distributed by the State with the list published by the Administrator in the January 18, 1990 Federal Register, which ACORN alleges was the list the LCCA requires to be disseminated, reveals that the Fact Sheet contains all of the brands and models listed in the Federal Register, plus seven others.

42 U.S.C. § 300j-24(c) (emphasis added).[10] Section 300j-23(a) calls upon the Administrator to "identify each brand and model of drinking water cooler which is not lead free" and to "publish a list of each brand and model of drinking water cooler [so] identified." 42 U.S.C. § 300j-23(a) (emphasis added). Neither provision unambiguously establishes how or where publication is to be made, nor do we think we need attempt to do so.

Assuming arguendo "publish" equates to "publish in the Federal Register," that Defendants may have failed to comply technically with the statute is unpersuasive. The Fact Sheet listed all of the suspect drinking water coolers contained in the Federal Register list. In addition, the Fact Sheet listed seven other models originally thought to be non-lead free. Albeit these seven additional models were later determined to have been incorrectly included by the Administrator on the Fact Sheet, dissemination of the over-inclusive Fact Sheet does not defile the purpose of the LCCA. The error, if any, on the part of Defendants was inconsequential, in that the entities receiving the Fact Sheet were encouraged to be more, rather than less, cautious in determining which drinking water coolers in their possession posed a health

---

[10] There has never been any contention by ACORN that the Defendants failed to properly disseminate the EPA's guidance document and testing protocol. Notably, though, § 300j-24(b) provides that the Administrator "shall publish a guidance document and a testing protocol." (Emphasis added.). The Administrator, having generated these documents, has never published more than a notice of their availability in the Federal Register. See, e.g., Notice, 54 Fed. Reg. 14,316 (1989). Thus, the "published" documents distributed by the State in compliance with this requirement were not documents "published in the Federal Register."

risk.  ACORN is correct that Defendants distributed a list containing erroneous information.[11]  However, Defendants erred in favor of the State's school children, the ultimate beneficiaries of the LCCA, and we see no reason to penalize the State for such an innocuous transgression.  Accordingly, regardless of how we define "publish," as used in the LCCA, we find Defendants' distribution of the EPA Fact Sheet, in this case, sufficient to bring the State into compliance with § 300j-24(c) prior to ACORN filing suit.  As such, we conclude that ACORN failed to show that Defendants violated this requirement of the LCCA, and that ACORN is therefore not entitled to attorney's fees incurred in pursuing its § 300j-24(c) claim.

---

[11]  ACORN contends that Defendants failure to distribute the Federal Register list is not harmless because the Federal Register contained additional information and an advisory with a toll free number regarding Halsey Taylor water coolers with lead-lined tanks. We are not swayed for two reasons.  Although this information may be useful, it is not information which the LCCA requires the Administrator to compile and include in the list of non-lead free drinking water coolers.  See 42 U.S.C. § 300j-23(a) ("[T]he Administrator shall publish a list of each brand and model of drinking water cooler identified under this subsection.  Such list shall separately identify each brand and model of cooler which has a lead-lined tank.  The Administrator shall continue to gather information regarding lead in drinking water coolers and shall revise and republish the list from time to time as may be appropriate as new information or analysis becomes available . . . .").  Further, review of the EPA Fact Sheet reveals that the bottom, right-hand corner contains the following disclaimer:

Note: A number of water coolers have been deleted from the proposed list identifying them as not lead free.  For information about these water coolers and others, refer to the January 18, 1990 Federal Register notice.

Thus, persons seeking information in addition to the list of non-lead free coolers contained in the Fact Sheet are directed to the Federal Register.

11

**B. 42 U.S.C. § 300j-24(d)**

Heeding the Supreme Court's admonition to avoid unnecessary resolution of constitutional questions, we have foregone determining whether § 300j-24(c) breaches the Tenth Amendment. Section 300j-24(d), however, does not escape such inquiry.

In the course of oral argument, we asked the parties to submit post-argument memoranda on whether the provisions of the LCCA at issue violated the Tenth Amendment. Subsequent to these submissions, we permitted the United States to intervene to assert its views. Much of the arguments focus on whether the teachings of New York v. United States, __ U.S. __, 112 S.Ct. 2408 (1992), are controlling. ACORN contends that if Congress acts legitimately under an Article I power to regulate activity, the Tenth Amendment has no sway. On the other hand, Defendants argue New York stands for the proposition that Congress cannot impose any requirement on the States pursuant to the exercise of its Commerce Clause power. Although we agree that New York is an appropriate starting point for our analysis, we recognize that neither ACORN nor Defendants properly grasp the interplay between Congress' exercise of its Article I powers and the Tenth Amendment, as that interplay was described by the New York Court.

**1. The Tenth Amendment**

The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." It has been said that "[t]he amendment states but a truism that all

12

is retained which has not been surrendered."  See <u>United States v.</u>
<u>Darby</u>, 312 U.S. 100, 124 (1941).  However, in <u>New York</u>, the Supreme
Court elucidated the broader effect of this amendment:

> The Tenth Amendment . . . restrains the power of Congress, but
> this limit is not derived from the text of the Tenth Amendment
> itself, which . . . is essentially a tautology.  Instead, the
> Tenth Amendment confirms that the power of the Federal
> Government is subject to limits that may, in a given instance,
> reserve power to the States.  The Tenth Amendment thus directs
> us to determine . . . whether an incident of state sovereignty
> is protected by a limitation on an Article I power.

<u>New York</u>, __ U.S. at __, 112 S.Ct. at 2418.  The Tenth Amendment,
therefore, incorporates extra-textual limitations upon Congress'
exercise of its Article I powers.  Thus, when an Act of Congress is
challenged under the Tenth Amendment, we must be concerned not only
with whether Congress has the power under Article I to regulate the
activity in question, but also with whether the method by which
Congress has chosen to regulate the activity pursuant to that power
invades that province of state sovereignty protected by the Tenth
Amendment.  <u>Id</u>. at __, 112 S.Ct. at 2419-20.  In this case, the
parties concede that Congress may, pursuant to its Commerce Clause
power, regulate lead-contaminated drinking water coolers.[12]
Accordingly, our focus is on whether the method of regulation
chosen by Congress in § 300j-24(d) impermissibly intrudes upon
state sovereignty.  To answer this question, we begin by reviewing

-----

[12]    Defendants argue that, while regulating lead-contaminated
drinking water coolers is within Congress' Commerce Clause power,
requiring States to develop testing programs and to distribute EPA
lists are not.  We agree with the United States that the better
approach is to focus on whether requiring such actions of the
States is an appropriate <u>means</u> of regulating such drinking water
coolers.

13

New York.

### 2. The Tenth Amendment and New York v. United States

In New York, the Supreme Court faced a challenge by the State of New York and two of its counties to the three-tiered incentive system contained in the Low-Level Radioactive Waste Policy Amendments Act of 1985, Pub. L. No. 99-240, 99 Stat. 1842 (codified at 42 U.S.C. § 2021b et seq.). The purpose of the Act was to place on each state responsibility to provide for the disposal of low-level radioactive waste generated within its borders. To encourage the States to comply with this statutory responsibility, the Act provided three types of incentives: (1) monetary incentives--i.e., a portion of surcharges received by states currently operating disposal sites were to be remitted into an escrow account operated by the Secretary of Energy who would then disburse this fund to states that complied with statutorily prescribed deadlines; (2) access incentives--i.e., states that failed to meet statutorily prescribed deadlines could be denied access to disposal sites in other states or regions; and (3) a take title provision--i.e., any state that fails to provide for disposal of waste generated within its borders by January 1, 1996, must take title to the waste, is obligated to take possession of the waste, and bears liability for all damages incurred by a generator or owner of such waste incurred as a consequence of the State's failure to take possession. The State of New York opposed all three incentive provisions, asserting inter alia that the incentives were unconstitutional violations of the Tenth Amendment.

14

The Supreme Court, speaking through Justice O'Connor, held only the take title provision unconstitutional.  In reaching this conclusion, Justice O'Connor deduced that the take title provision offered state governments a "choice" of either accepting ownership of and liability for waste or regulating its disposal according to Congress' instructions.  New York, __ U.S. at __, 112 S.Ct. at 2428.  Finding both options, standing alone, to be outside Congress' authority, she determined that a choice between them was, in fact, "no choice at all."  Id.  "Either way, 'the Act commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program,' an outcome that has never been understood to lie within the authority conferred upon Congress by the Constitution."[13]  Id. (citation omitted).  Indeed, she elaborated:

> States are not mere political subdivisions of the United States.  State governments are neither regional offices nor administrative agencies of the Federal Government.  The positions occupied by state officials appear nowhere on the Federal Government's most detailed organizational chart.  The Constitution instead "leaves to the several States a residuary and inviolable sovereignty," The Federalist No. 39, p. 245 (C.

---

[13]  Justice O'Connor did recognize that Congress has several ways of influencing the actions of the States that comply with our notions of federalism.  For example, Congress can subject state governments to laws of general applicability--i.e., laws that apply equally to the States as to private parties.  See, e.g., Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528 (1985).  Also, under its spending power, Congress may attach to the receipt of federal funds conditions that have the affect of influencing state legislative choices.  See, e.g., South Dakota v. Dole, 483 U.S. 203 (1987).  Further, where Congress may regulate pursuant to its Commerce Clause power, it also has the power to offer States a choice of legislating according to Congressional instruction or having state law preempted by federal regulation.  See, e.g., FERC v. Mississippi, 456 U.S. 742 (1982); Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264 (1981).

15

Rossiter ed. 1961), reserved explicitly to the States by the Tenth Amendment.

Whatever the outer limits of that sovereignty may be, one thing is clear: The Federal Government may not compel the States to enact or administer a federal regulatory program.

Id. at __, 112 S.Ct. at 2434-35.

### 3. The Tenth Amendment, New York v. United States, and § 300j-24(d)

Few Congressional enactments fall as squarely within the ambit of New York as does § 300j-24(d). Section 300j-24(d) requires each State to "establish a program, consistent with this section," to assist local educational agencies, schools, and day care centers in remedying potential lead contamination in their drinking water systems. Failure or refusal to establish the mandated program subjects the States to civil enforcement proceedings. 42 U.S.C. § 300j-8(a). The States thus face a choice between succumbing to Congressional direction and regulating according to Congressional instruction, or being forced to do so through civil action in the federal courts. In actuality, this "is no choice at all." The LCCA gives the States no alternative but to enact the federal regulatory plan as prescribed in § 300j-24(d), and such Congressional conscription of state legislative functions is clearly prohibited under New York's interpretation of the limits imposed upon Congress by the Tenth Amendment.

Congress is free, pursuant to its Commerce Clause power, to combat lead contamination in drinking water by regulating drinking water coolers that move in interstate commerce. Such regulation, however, must operate directly upon the people, and not the States

16

as conduits to the people. "The allocation of power contained in the Commerce Clause . . . authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce." New York, __ U.S. at __, 112 S.Ct. at 2423. Section 300j-24(d) is an attempt by Congress to force States to regulate according to Congressional direction. As the New York Court explained, the Constitution does not permit Congress to so control the States' legislative processes.

ACORN and the United States argue § 300j-24(d) is a valid exercise of Congress' Commerce Clause power because it affords the States complete discretion to determine the means employed in achieving the LCCA's goals. The New York Court addressed an identical argument and rejected it stating: "This line of reasoning . . . only underscores the critical alternative a State lacks: A State may not decline to administer the federal program. No matter which path the State chooses, it must follow the direction of Congress." New York, __ U.S. at __, 112 S.Ct. at 2429. Because § 300j-24(d) deprives States of the option to decline regulating non-lead free drinking water coolers, we likewise find no merit to this argument and conclude that § 300j-24(d) is an unconstitutional intrusion upon the States' sovereign prerogative to legislate as it sees fit.

## IV. Conclusion

Section 300j-8(d) allows the district court to award attorney's fees "in issuing any final order in any action brought

17

under [§ 300j-8(a)]." Section 300j-8(a)(1), in turn, allows suits against governmental instrumentalities only when the instrumentality is alleged to be in violation of a requirement of the SDWA. We hold that Defendants distribution of the EPA Fact Sheet was sufficient to bring the State of Louisiana into compliance with the LCCA. As such, Defendants were not in violation of the requirement imposed by § 300j-24(c) at the time ACORN commenced this litigation. Further, we hold that the requirements imposed by Congress upon the States under § 300j-24(d) violate the Tenth Amendment and are unconstitutional. Hence, because ACORN has failed to establish that Defendants were in violation of any lawful requirement of the LCCA at the time it commenced this suit, the district court's award of attorney's fees to ACORN under § 300j-8(d) was improper. The judgment of the district court awarding attorney's fees to ACORN, for payment by them to their attorneys, is therefore REVERSED, and ACORN's claims are DISMISSED.