**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                      No. 96-4323

GARY NELSON JOHNSON,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan Jr., Senior District Judge.
(CR-96-107)

Argued: December 2, 1996

Decided: May 30, 1997

Before WIDENER and MURNAGHAN, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by published opinion. Senior Judge Phillips wrote the opinion, in which Judge Widener and Judge Murnaghan joined.

_____

**COUNSEL**

**ARGUED:** Dale Warren Dover, Alexandria, Virginia, for Appellant. David S. Kris, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney, Gerald J. Smagala, Assistant United States Attorney, Valerie G. Preiss, Assistant United States Attorney, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

**OPINION**

PHILLIPS, Senior Circuit Judge:

Gary Nelson Johnson appeals his conviction for willfully failing to pay child support in violation of the Child Support Recovery Act (CSRA or the Act), 18 U.S.C. § 228, contending that Congress' enactment of the CSRA exceeded its powers under the Commerce Clause and violated the Tenth Amendment and, alternatively, that the Government failed to prove his paternity which, he argues, is an essential element of the offense. We hold that the CSRA's enactment was a valid exercise of Congress' Commerce Clause powers and did not violate the Tenth Amendment, and that paternity is not an element of the offense of conviction. Accordingly, we affirm Johnson's conviction.

I.

Gary Nelson Johnson married Mary Rauss on May 25, 1985, and lived with her in Endicuit, New York until 1987. In October of that year, Rauss moved to Virginia with the understanding that Johnson would follow her in December after he completed the current academic semester. Johnson instead continued to reside in New York but did visit his wife in Virginia without establishing a residence there. Their daughter, Marisa, was born in Virginia on August 18, 1988.

Johnson and Rauss were divorced by a final decree of the Circuit Court of Prince William County, Virginia, on October 6, 1989. The Virginia decree ordered Johnson to pay $25 per week in child support and was made the basis of an order for that level of child support by a New York Family Court in the county where Johnson resided at the time. Following unsuccessful attempts by the New York Family Court to obtain compliance with its order, that court entered contempt orders against Johnson on May 26, 1989, December 26, 1989, March 20, 1990, June 27, 1990, September 26, 1990, and on May 14, 1991. Then, on September 16, 1991, the New York court issued a warrant for Johnson's arrest. Avoiding arrest on the state warrant, Johnson moved to Florida where he remarried, began working and earning money, and with his second wife, acquired assets of substantial value. Johnson never contacted the Family Court regarding the

2

child support he owed. His intent to defy the state court orders was manifested, in part, by letters he wrote to Rauss. In one letter, postmarked February 16, 1989, Johnson wrote:

> If you persist [in seeking child support], I'll do whatever is necessary to continue on my present directive. Even if it means moving from Bing[hampton] N.Y. so nobody knows where the hell I am. I've already explained to you that I cannot pay you anything right now. Whatever money I do make in the summer goes towards my financial needs throughout the school year. I'm sorry but you are not going to alter that, I don't care what the law is.

In a one count criminal information filed on September 6, 1995, the Government charged Johnson with knowingly and intentionally failing to pay child support from June 1991 to December 1995, in violation of the CSRA. On June 20, 1995, he was arrested in Florida by FBI agents on the federal charge. At the time, he owed more than $5,000 in state court-ordered child support. In a pre-trial motion, Johnson sought dismissal of the CSRA charges on grounds that the Act exceeded Congress' powers under the Commerce Clause and, furthermore, violated the Tenth Amendment. The magistrate judge to whom the case was referred for trial reserved decision on the constitutional issue and the case proceeded to bench trial. At trial, Johnson defended essentially on a claim of non-parentage, contending that parentage was an essential element of the CSRA offense. The parties introduced conflicting evidence on this defense, but in the end the magistrate judge rejected it both on the legal ground that paternity was not an essential element of the offense, J.A. 89, and that in any event paternity had been proven if that were necessary. J.A. 227. The court then found Johnson guilty of the charge, rejected Johnson's constitutional defenses, sentenced him to 60 days imprisonment, imposed a fine of $1,000, and ordered restitution in the amount of $6,813.90.

On Johnson's appeal to the district court, his conviction and sentence were affirmed, and his appeal to this court followed. In it, Johnson challenges the district court's rulings (affirming the magistrate judge) that (1) the CSRA is a constitutional exercise of Congress' powers under the Commerce Clause and does not violate the Tenth Amendment, and (2) parentage is not an element of the CSRA

3

offense, hence need not be proven to convict on a CSRA charge.**1** We take these in order, reviewing each <u>de novo</u> as a ruling of law.

II.

The Commerce Clause constitutional issue is one of first impression with us, but it has at this writing been addressed by five other federal courts of appeal. Each has upheld the CSRA as a constitutional enactment under the Commerce Clause. <u>See United States v. Parker</u>, 108 F.3d 28 (3d Cir. 1997); <u>United States v. Bongiorno</u>, 106 F.3d 1027 (1st Cir. 1997); <u>United States v. Mussari</u>, 95 F.3d 787 (9th Cir. 1996); <u>United States v. Hampshire</u>, 95 F.3d 999 (10th Cir. 1996);

_____

**1** The statute, 18 U.S.C. § 228, provides in relevant part:

> (a) Offense.--Whoever willfully fails to pay a past due support obligation with respect to a child who resides in another state shall be punished as provided in subsection (b).
>
> (b) Punishment.--The punishment for an offense under this section is--
>
> (1) in the case of a first offense under this section, a fine under this title, imprisonment for not more than 6 months, or both; and
>
> (2) in any other case, a fine under this title, imprisonment for not more than 2 years, or both.
>
> (c) Restitution.--Upon a conviction under this section, the court shall order restitution under section 3663 in an amount equal to the past due support obligation as it exists at the time of sentencing.
>
> (d) Definitions.--As used in this section--
>
> (1) The term "past due support obligation" means any amount--
>
> (A) determined under a court order or an order of an administrative process pursuant to the law of a State to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living; and
>
> (B) that has remained unpaid for a period longer than one year, or is greater than $5,000.

4

and <u>United States v. Sage</u>, 92 F.3d 101 (2d Cir. 1996). We now join these circuits in so holding. Our analysis, essentially following theirs, can be brief.

We start, as is presently routine in Commerce Clause analysis, by noting that in <u>United States v. Lopez</u>, 115 S. Ct. 1624 (1995), the Supreme Court recently recognized, reaffirming the tripartite test for Commerce Clause analysis outlined in <u>Perez v. United States</u>, 402 U.S. 146, 150 (1971), that Congress may under that Clause regulate three broad categories of activity: (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons and things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "activities having a substantial relation to interstate commerce, i.e. . . . substantially affect[ing] interstate commerce." 115 S. Ct. at 1629-30 (internal citation omitted).[2]

Looking to these three possible sources of Commerce Clause power to enact the CSRA, we pass categories (1) ("use of the channels of commerce") and (3) ("activities substantially affecting interstate commerce") and conclude--as the district court (affirming the

_____

[2] Addressing the constitutionality of the Gun-Free School Zones Act, 18 U.S.C. § 922(g) (GFSZA), which criminalizes the possession of firearms in specified proximity to schools, the <u>Lopez</u> Court summarily held that because the Act obviously regulated neither "use of the channels" nor "the instrumentalities" of interstate commerce, it could not be upheld as either a category (1) or (2) exercise of Commerce Clause power, 115 S. Ct. at 1630, and analyzed in depth only its possible constitutionality as a category (3) regulation of activities having a substantial effect on interstate commerce. Rejecting category (3) as the remaining possible source, the Court held GFSZA unconstitutional.

Aside from its general reaffirmation of the continued vitality of three-category Commerce Clause analysis, <u>Lopez's</u> widely recognized importance therefore consists exclusively of the new guidance given on category (3) analysis. Its consideration of categories (1) and (2) was limited to noting their obvious inapplicability to the statute at issue, and it therefore gave no new guidance for analysis of arguable applications of those categories.

magistrate judge) held--that CSRA is a constitutional exercise of Congress' category (2) power under the Commerce Clause.[3]

Specifically, we agree with those circuits which have held that the CSRA properly regulates, as a "thing in interstate commerce," the obligation created by state-court child support orders when, as the Act requires, and as is the situation in this case, the obligated parent and the dependent child reside in different states. See Bongiorno, 106 F.3d at 1031, 1032 (concluding that because such orders are "functionally equivalent to interstate contracts," they are"things in interstate commerce" subject to regulation to "prevent their non-fulfillment"); Hampshire, 95 F.3d at 1003 (concluding that the CSRA validly regulates a "court-ordered obligation to pay money in interstate commerce"); Mussari, 95 F.3d at 390 (concluding that the support obligation is a "thing in interstate commerce" because it must be met "by a payment that will normally move in interstate commerce"); Sage, 92 F.3d at 105-106 (concluding that court-ordered support obligation requiring that money be sent from one state to another is commerce that may be regulated to prevent frustration of the monetary obligation).

We find the reasoning of these courts persuasive and join them in the conclusion that the CSRA is a constitutional exercise of Commerce Clause powers in regulating category (2) activity.

III.

We also conclude that the CSRA does not violate the Tenth Amendment. That amendment provides, with deceptive simplicity, that "The powers not delegated to the United States by the Constitu-

_____

[3] The district court--affirming the magistrate judge--held that the CSRA was a proper exercise of both category (2) and category (3) Commerce Clause powers. In consequence, Johnson devotes considerable effort on this appeal to demonstrating that the district court's category (3) ruling is erroneous under Lopez's arguably new and less deferential category (3) analysis. Because we rely solely on category (2) as the proper source of power to enact CSRA, we need not address Johnson's contentions as to Lopez's implications for category (3) Commerce Clause analysis and their application to the CSRA. See note 2, ante.

6

tion, nor prohibited by it to the States, are reserved to the States respectively or to the people." U.S. Const. amend X. Under the Supreme Court's interpretation of the amendment, we ask two questions to determine whether a statute violates it: First, whether the regulation it embodies is within Congress' raw power as being within those enumerated in the constitution. Second, whether, even if so, the means of regulation employed yet impermissibly infringe upon state sovereignty. New York v. United States, 505 U.S. 144, 159, 188 (1992) (so concluding, in process of holding that while Congress had raw Commerce Clause power to regulate disposal of low level nuclear waste, means chosen, of effectively requiring states to regulate, impermissibly infringe on state sovereignty). See also ACORN v. Edwards, 81 F.3d 1387, 1393 (5th Cir. 1996) (same).

The first question reflects the obvious fact that an exercise of a constitutionally-enumerated power cannot involve a"power[ ] not delegated to the United States," hence is not within a realm of power reserved by the Tenth Amendment to the states. So, in this case, we already have answered the first Tenth Amendment question in the affirmative in the process of holding the CSRA a valid enactment under Congress' enumerated Commerce Clause power. Accord Mussari, 95 F.3d at 791; Hampshire, 95 F.3d at 1004.

That leaves only the question whether the means of regulation employed, like those found violative of the Tenth Amendment in New York, nevertheless impermissibly infringe on state sovereignty. We conclude that they do not.

Johnson contends that the CSRA's method of regulation--criminalizing the willful non-payment of state-ordered child support --does impermissibly infringe on two traditional areas of state sovereignty: criminal law and family law. And, he contends that it has the further vice found violative in New York of regulating the "states as states" by interfering with their parens patriae roles in relation to minors. We disagree on each of these points.

Federal laws criminalizing conduct within traditional areas of state law, whether the states criminalize the same conduct or decline to criminalize it, are of course commonplace under the dual-sovereign concept and involve no infringement per se of states' sovereignty in

7

the administration of their criminal laws. See , e.g., Cleveland v. United States, 329 U.S. 14, 19 (1946) (Mann Act's criminalization of interstate transportation for purposes of prostitution not unconstitutional invasion of traditional area of state regulation); Mussari, 95 F.3d at 791 (no concerns of federalism and comity implicated by federal law criminalizing interstate conduct not criminalized by state where conduct occurred). So long as a federal criminal statute falls within the "limits of the Commerce Clause, it withstands the challenge that it interferes with the states' ability to define and enforce the criminal law." United States v. Di Santo, 86 F.3d 1238, 1246 (1st Cir. 1996). And, in any event, rather than displacing or undercutting state laws in the area of child-support, the CSRA "supplements such state initiatives by fortifying law enforcement efforts and existing state penalties." Hampshire, 95 F.3d at 1004; Sage, 92 F.3d at 107.

Johnson's specific suggestion of the CSRA's impermissible invasion of state sovereignty in the area of domestic relations is that it violates the "domestic-relations exception" to federal jurisdiction and the policies of federalism and comity that underlie it. There is no merit to this contention. The "jurisdictional exception," in the first place, is applied only as a judicially implied limitation on the diversity jurisdiction; it has no generally recognized application as a limitation on federal question jurisdiction. See Ankenbrandt v. Richards, 504 U.S. 689, 700-01 (1992) (observing that the exception is grounded in traditional construction of the diversity statute and has no constitutional foundation). In any event, the CSRA does not attempt to regulate domestic relations. It does not purport to modify, or to allow federal judicial modification of, any state domestic relations law or judicial decree; nor to require state enforcement of its own domestic relations laws and decrees. See Sage, 92 F.3d at 107. Instead, as earlier noted, its whole thrust is toward supplementation rather than displacement or undercutting of state initiatives in the enforcement of state domestic relations law respecting child-support.

Confronted with the need under New York to demonstrate that CSRA effectively regulates the "states as states" and thereby impermissibly invades by this means state sovereignty, Johnson contends that it does so by regulating conduct in the realm of minor children's well-being, which necessarily infringes upon the states' parens patriae powers to protect those very interests. This is more of a

8

stretch than parens patriae doctrine and Tenth Amendment doctrine in combination can bear.

At bottom, parens patriae is a standing doctrine under which a state may under proper circumstances sue on behalf of its citizens when a separate quasi-sovereign interest also is at stake. See Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 600-01 (1982) (holding that Puerto Rico had parens patriae standing to seek redress from private parties for discriminating against its citizens in ways that impaired state's participation in federal employment programs). The doctrine is a quite limited one; it does not confer standing upon a state simply to represent the interests of any of its citizens who, for whatever reason, cannot represent themselves; there must be an independent state sovereign interest at stake. Id. at 600; see also Pennsylvania v. New Jersey, 426 U.S. 660 (1976) (no parens patriae standing in state to represent citizens in dispute between states over allegedly discriminatory tax).

Here, even if it were assumed that federal legislation might be thought to "regulate the states as states" in violation of the Tenth Amendment simply by regulating private party conduct which the states had parens patriae standing to challenge--a dubious proposition--we do not see how the states could be thought to have parens patriae standing to challenge the conduct criminalized by the CSRA. No quasi-sovereign interest separate and apart from the dependent children's interests exists in the enforcement of state child support orders; if a state appeared as a party in such an enforcement action, its interest would only be a nominal one, not a "real," separate state interest. See Snapp, 458 U.S. at 600. Certainly no such quasi-sovereign interest has been suggested to us.

Accordingly, we conclude that the CSRA does not violate the Tenth Amendment.

IV.

Finally, we consider Johnson's contention that the district court erred in holding that the Government need not prove his paternity as an essential element of the CSRA offense in order to convict him under 18 U.S.C. § 228. We review that ruling de novo, United States

9

v. Aramony, 88 F.3d 1369, 1383 (4th Cir. 1996), and doing so, affirm it.

The elements of a criminal offense are as defined by the statutory language, which we interpret according to the traditional canons of statutory interpretation, including preeminently the plain meaning canon. <u>See United States v. Johnson</u>, 32 F.3d 82, 84 (4th Cir. 1994). By its plain language, the CSRA does not define parentage as an essential element of the CSRA offense. Rather, the elements of the offense are (1) a willful (2) failure to pay (3) a past due support obligation, defined as "any amount . . . determined under a court order or an order of an administrative process pursuant to the law of a state to be due . . . ," (4) with respect to a child who resides in another state. 18 U.S.C. § 228. Under a plain meaning interpretation, the Government must of course prove as an aspect of the third element the existence of a state judicial or administrative order creating the requisite support obligation. It may do this with a properly authenticated record of the order, as was done here. But, the Government need not go beyond that to prove beyond a reasonable doubt the facts necessarily found as predicates for the support order, including the critical fact of parentage. Nor may a defendant raise non parentage as a defense and require its relitigation. Authenticity of the record might of course be challenged, and if such a challenge succeeded, the prosecution would fail. But, as the district court rightly ruled, the statute does not require or permit relitigation of the issue of parentage in prosecutions under the CSRA.

This does not quite end the matter, however. Though confusedly, Johnson has argued both below and on this appeal that due process concerns require affording him the right to relitigate the parentage issue. In support, he cites and relies upon the Supreme Court's decision in <u>United States v. Mendoza-Lopez</u>, 481 U.S. 828 (1987), in which the Court held that in a prosecution under 8 U.S.C. § 1326 for illegal entry into the United States following deportation, the defendant was entitled under the circumstance of the case to make a due process challenge to the prior administrative deportation order. <u>Id</u>. at 834-36.

<u>Mendoza-Lopez</u> does not, however, help Johnson. In the first place, it does not hold that whenever a federal prosecution depends upon

10

proof of a prior judicial or administrative determination of guilt or civil liability for a specified offense, due process requires proof again, and beyond a reasonable doubt, of the essential elements of the predicate offense. Rather, it only provides a narrow means for challenging, on due process grounds, the constitutional validity of the predicate order in issue and, on that basis, the Government's ability to prove, as an essential element of the offense being prosecuted, the fact of the predicate determination. Id. at 480 (holding that upon a successful due process challenge of such predicate orders, "[t]he Government may not, therefore rely on those [predicate] orders as reliable proof of an element of a criminal offense").

It is not at all clear that Johnson has actually sought to invoke the Mendoza-Lopez principle for its proper function of allowing a limited due process collateral challenge to the predicate state support order, as opposed to entitling him fully to relitigate the parentage issue. Out of caution, we can assume that he has, but assuming so, it does not serve him.

Giving the Mendoza-Lopez principle its widest possible scope, Johnson could not invoke it to defeat his prosecution. Assuming, without deciding in view of the uncertain nature of Johnson's claim, that the principle applies to CSRA prosecutions as it was applied to the immigration prosecution at issue in Mendoza-Lopez, see United States v. Lewis, 936 F. Supp. 1093, 1102-03 (D.R.I. 1996) (holding that principle applies in CSRA prosecutions), and that as to CSRA prosecutions it applies to judicial orders as well as administrative orders, see United States v. Collins, 921 F. Supp. 1028, 1031-32 n.15 (W.D.N.Y. 1996) (reserving question of applicability to judicial child-support order in CSRA prosecution), Johnson could not meet its critical requirement that, for whatever reason beyond his control, he had no means within the state court system effectively to challenge for fundamental unfairness[4] the predicate child support order. See

_____

**4** The closest that Johnson could be thought to have come to identifying any "fundamental unfairness" in the state child-support proceeding--as opposed to simple fact-finding trial court error--is in his suggestion that Johnson's wife gave perjured testimony respecting Johnson's parentage of their child. Appellant's Br. 8, 21-22. Aside from our great doubt that

11

Mendoza-Lopez, 481 U.S. at 840-41 (holding that the unavailability of effective judicial review of the predicate administrative order there at issue was what necessitated allowing collateral review of its fundamental fairness in the federal prosecution). In Johnson's case, there was abundant opportunity, which he presumably has not taken, to challenge the Virginia divorce proceeding in which the child support order was entered, both by direct appeal, Va. Code Ann., § 17-116.05 3.d. (appeals may be taken of right from Circuit Court child support orders), and by collateral attack on the order. Va. Code Ann. § 8.01-428 (1996) (Virginia courts may set aside, inter alia, void judgments or judgments based on fraud); Dorn v. Dorn, 279 S.E.2d 393 (Va. 1981) (§ 8.01-428 relief available to correct child support order).

We therefore conclude that Johnson is not entitled to reversal of his conviction for failure of the Government to prove parentage, nor to challenge for fundamental unfairness the predicate Virginia court order which imposed the child support obligation at issue.

AFFIRMED

_____

party perjury--even that amounting to fraud on the court--could constitute the sort of "fundamental unfairness" contemplated in Mendoza-Lopez, we observe that the inconsistencies in the wife's testimony upon which Johnson relies are by no means necessarily demonstrative of perjury. Indeed, the magistrate judge, addressing the factual issue despite his belief that it was not properly subject to relitigation in the CSRA prosecution, plausibly resolved it against Johnson as essentially one of credibility. J.A. 191, 193, 201.

12