**UNITED STATES of America, Plaintiff,**

**v.**

**Keith Douglas BAILEY, Defendant.**

**Crim. No. SA–95–CR–138.**

United States District Court,
W.D. Texas,
San Antonio Division.

Oct. 25, 1995.

Paul Joseph Brake, Federal Public Defender's Office, San Antonio, TX, for defendant.

Joan Lynn Marshall, U.S. Attorney's Office, San Antonio, TX, for plaintiff.

## OPINION

BIERY, District Judge.

In conjunction with the Court's Order of September 7, 1995, holding the Child Support Recovery Act ("CSRA"), 18 U.S.C. § 228, unconstitutional, the following opinion is issued:

Once upon a time, Keith and Lisa Bailey were, or at least thought they were, in love. The courtship culminated in marriage and the birth of a child. Alas, the ardor cooled and divorce ensued, with custody of the child being placed with Ms. Bailey. Believing custodial parents like Ms. Bailey needed additional means to collect unpaid child support payments, in 1992 Congress passed 18 U.S.C.

§ 228, making it a federal criminal offense if a parent "willfully fails to pay a past due support obligation with respect to a child who resides in another state." Though the record reflects Ms. Bailey availed herself successfully of at least one of numerous other state remedies for collecting child support, she nevertheless also sought criminal punishment of Mr. Bailey pursuant to 18 U.S.C. § 228. The Court assumes the Baileys' once tender feelings for one another are now more akin to ashes than embers.

First, the issue before the Court is not Mr. Bailey's moral or legal obligation to support his child. About this, there is no doubt: Mr. Bailey should fulfill his parental responsibilities. Nor is this a public policy debate about using limited federal law enforcement and judicial resources as a debt collection agency; for as a practical matter defendants convicted under 18 U.S.C. § 228 would more often than not be put on probation and ordered to make child support payments. One might reasonably argue, however, those limited resources can be used in better ways.

Rather, the question to be addressed is the constitutional balance of federalism between the central government and the states as affected by the Commerce Clause and recent pronouncements by the Supreme Court in relationship thereto. *See United States v. Lopez,* —— U.S. ——, —— - ——, 115 S.Ct. 1624, 1637–42, 131 L.Ed.2d 626 (1995) (Kennedy, J., concurring). It is of course a lower court's duty, in the judicial chain of command, to follow the dictates of those Supreme Court decisions or to glean guidance therefrom if the exact issue has not yet been addressed. In *Lopez,* the majority opinion reviews the historical evolution of the Commerce Clause and identifies three broad categories of activity which Congress may regulate under its commerce power:

A. Congress may regulate the use of the channels of interstate commerce;

B. Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come from intrastate activities;

C. Congress may regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

*Id.* at —— - ——, 115 S.Ct. at 1629–30 (citations omitted).

Speaking for the majority in *Lopez,* Chief Justice Rehnquist rejects the government's "national productivity" reasoning, opining that were the Supreme Court to accept such reasoning Congress could regulate any activity it found was related to the economic productivity of individual citizens such as marriage, divorce and child custody—the relationships and activities involved between Mr. and Ms. Bailey in this case. *Id.* at ——, 115 S.Ct. at 1632. The *Lopez* majority also rejects the concept that the Commerce Clause gives Congress authority to exercise a general police power of the sort retained by the states, such as regulating each and every aspect of local schools. *Id.* at ——, 115 S.Ct. at 1633. Given the language and guidance of the *Lopez* majority, a reasonable inference can be made that the Supreme Court would also find constitutionally infirm Congress' attempt to regulate the family law relationship of Mr. and Ms. Bailey.

Moreover, it is clear the Supreme Court disfavors federal intervention in state court matters:

the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the states and their institutions are left free to perform their separate functions in their separate ways.

*Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971); *see also Byrne v. Karalexis,* 401 U.S. 216, 220, 91 S.Ct. 777, 779–80, 27 L.Ed.2d 792 (1971); *Dyson v. Stein,* 401 U.S. 200, 203, 91 S.Ct. 769, 771, 27 L.Ed.2d 781 (1971); *Perez v. Ledesma,* 401 U.S. 82, 84–85, 91 S.Ct. 674, 676–77, 27 L.Ed.2d 701 (1971); *Boyle v. Landry,* 401 U.S. 77, 81, 91 S.Ct. 758, 760, 27 L.Ed.2d 696 (1971). "[T]his interdiction of federal interference in state judicial proceed-

ings is based on federalism concepts of comity and respect for state functions...." *Duke v. Texas,* 477 F.2d 244, 248 (5th Cir. 1973), *cert. denied,* 415 U.S. 978, 94 S.Ct. 1565, 39 L.Ed.2d 874 (1974). Under the reciprocal doctrine of federal-state comity, the Supreme Court has also announced a fundamental policy against federal interference with state criminal prosecutions. *Kugler v. Helfant,* 421 U.S. 117, 123, 95 S.Ct. 1524, 1530, 44 L.Ed.2d 15 (1975); *Schlesinger v. Councilman,* 420 U.S. 738, 754–55, 95 S.Ct. 1300, 1311, 43 L.Ed.2d 591 (1975).

As stated in *United States v. Mussari,* 894 F.Supp. 1360, 1367 (D.Ariz.1995):

> [A]ctual application of the CSRA would force federal courts to review and apply orders of state courts in violation of principles of federalism and comity. A defendant being prosecuted under the CSRA could arguably defend the action by challenging the validity of the underlying state court support order. Either the federal court would be forced to review the support order, or stay the pending federal criminal case while the support order is collaterally attacked in state court. Neither of these scenarios is desirable in light of the principles of comity and the speedy trial provisions federal courts are bound by in criminal matters.

(Rosenblatt, J.).

Further, even assuming a valid state court order at the time of issuance, the federal court in a CSRA prosecution would necessarily have to determine a defendant's present ability to obtain employment and comply with the state order. Presumably, we would not convict a non-paying parent who, subsequent to divorce, had become quadriplegic. This example supports our history of the federal courts not becoming embroiled in state family law matters and "maintaining a domestic relations exception to federal jurisdiction founded on the 'strong state interest in domestic relations matters, the competence of state courts in settling family disputes, the possibility of incompatible federal and state court decrees in cases of continuing judicial supervision by the state, and the problem of congested dockets in federal courts.'" *Rogers v. Janzen,* 891 F.2d 95, 97–

98 (5th Cir.1989) (citing *Crouch v. Crouch,* 566 F.2d 486, 487 (5th Cir.1978)). This exception encompasses cases involving child custody determinations. *Ankenbrandt v. Richards,* 504 U.S. 689, 704, 112 S.Ct. 2206, 2215, 119 L.Ed.2d 468 (1992); *see also Congleton v. Holy Cross Child Placement Agency,* 919 F.2d 1077, 1078–79 (5th Cir.1990) (if final resolution of federal case so intertwined with parental rights and custodial status of child that it cannot be fairly separated, domestic relations exception applies); *Rogers,* 891 F.2d at 98–99 (*claims requiring intrusive federal inquiry into parent-child relationship should be dismissed*); *Rykers v. Alford,* 832 F.2d 895, 900 (5th Cir.1987) (if federal court must determine who should receive custody or what rights noncustodial parent should have, then court should dismiss case). Fifteen years of experience in Texas courts convince this author that enforcement of 18 U.S.C. § 228 invariably would open the door to abatement motions and counterclaims for change of custody or defenses based on changed circumstances, e.g., the child is now de facto living with the noncustodial parent and therefore payments to the de jure custodial parent should cease.

The states have in fact provided numerous remedies to custodial parents. For example, all fifty states, Puerto Rico, and the District of Columbia have adopted reciprocal child support laws. Texas, in particular, has enacted the following statutory remedies for enforcement of child support orders:

1. TEX.FAM.CODE ANN. §§ 14.30–14.51 (Vernon 1986 & Supp.1995) (enforcement of court orders for child support);

2. TEX.FAM.CODE ANN. § 14.52 (Vernon Supp.1995) (delinquent child support obligor not eligible to receive state grants, loans or bid on state contracts);

3. TEX.FAM.CODE ANN. §§ 14.80–14.87 (Vernon Supp.1995) (expedited process to establish or enforce support obligations; cooperation with other states in Title IV–D cases)

4. TEX.FAM.CODE ANN. §§ 14.971–14.983 (Vernon Supp.1995) (property of obligor placed under child support lien);

5. Tex.Fam.Code Ann. § 15.02 (Vernon Supp.1995) (involuntary termination of parental rights for failure to pay child support);

6. Tex.Fam.Code Ann. §§ 21.01–25.02 (Vernon Supp.1995) (Uniform Interstate Family Support Act) (as noted above, forty-nine other states, Puerto Rico and the District of Columbia adopted complementary interstate laws);

7. Tex.Gov't Code Ann. § 466.407 (Vernon Supp.1995) (delinquent child support payments deducted from state lottery prizes);

8. Tex.Gov't Code Ann. § 501.014 (Vernon Supp.1995) (delinquent child support deducted from inmate trust account);

9. Tex.Hum.Res.Code Ann. §§ 76.001–77.001 (Vernon 1990 & Supp.1995) (Attorney General authorized to administer statewide plan for collection of child support funds, including garnishment of wages);

10. Tex.Hum.Res.Code Ann. § 151.004 (Vernon Supp.1995) (Domestic Relations Office authorized to collect delinquent child support payments);

11. Tex.Penal Code Ann. § 25.05 (Vernon 1994) (criminal nonsupport statute);

12. Tex.Code Crim.Proc.Ann. § 56.49 (Vernon Supp.1995) (crime victim's compensation fund award not exempt from child support obligation);

13. Tex.R.Admis Rule 6 (West 1995) (applicant for admission to Bar of Texas must show compliance with court orders regarding child support);

14. Tex.Lab.Code Ann. § 207.093 (Vernon Supp.1995) (Texas Unemployment Compensation Commission shall withhold unpaid child support from award).

15. Act of May 25, 1995, 74th Leg., R.S., ch. 751, § 85, 1995 Tex.Gen.Laws 3888, 3917 (to be codified at Tex.Fam. Code §§ 232.001–232.014) (business, professional, occupational licenses, including driver's license, will be suspended for failure to pay child support).

Indeed, Ms. Bailey has recently utilized state remedies to enforce regular child support payments from Mr. Bailey.

Interestingly, even the dissenters in *Lopez* agree there are some limitations on Congress' commerce power, such as family law. *See* — U.S. at — – —, 115 S.Ct. at 1661–62 (Breyer, J., dissenting). Legal and economic arguments to the contrary notwithstanding, a statute which sounds, walks, and looks like a duck must be a duck statute. *See Donovan v. Mercer,* 747 F.2d 304, 308–09 (5th Cir.1984). The CSRA, 18 U.S.C. § 228, sounds, walks, and looks like a domestic relations statute and aims the central government down a slippery slope where it should not be. Though there may be other bases by which to challenge the constitutionality of 18 U.S.C. § 228, it is this Court's humble opinion that notions of federalism and comity preclude the Child Support Recovery Act from passing constitutional scrutiny.

It is so ORDERED September 7, 1995.