UNITED STATES of America

v.

James N. LEWIS.

Civil Action No. 95–076P.

United States District Court,
D. Rhode Island.

Sept. 5, 1996.

Richard W. Rose, United States Attorneys Office, Providence, RI, for Plaintiff.

John M. Cicilline, Randy Olen, Providence, RI, for Defendant.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

Defendant James Lewis has been indicted for violation of the Child Support Recovery Act (CSRA), 18 U.S.C. § 228. The defendant has filed a Motion to Dismiss the Indictment, arguing that the CSRA exceeds Congress' authority under the Commerce Clause and invades state sovereignty under the Tenth Amendment. For the reasons discussed below, I find that the CSRA is constitutional and that this Court may retain jurisdiction. Therefore, the defendant's Motion is denied.

## FACTUAL BACKGROUND

On September 26, 1995, the defendant was indicted under the Child Support Recovery Act (CSRA), 18 U.S.C. § 228. The indictment charges that the defendant, starting January 7, 1993, willfully failed to pay a past due child support obligation as determined by the Circuit Court for Broward County, Florida. The indictment further alleges that the child is a resident of Rhode Island, while the defendant is not.

According to the defendant, on December 4, 1989, he was the defendant in a paternity suit in the Circuit Court in Broward County, Florida. On January 12, 1993, the Florida Hearing Officer in that court issued a report which established paternity and child support on the basis of the child's mother's affidavit.

The report states that the defendant failed to appear at several scheduled blood tests.

The defendant alleges that he never received notice or service of process in these state court proceedings. Since his arrest in the present case, the defendant has apparently petitioned the Broward County Circuit Court to set aside the judgment on the grounds that he had never received notice of the state court proceedings. According to the defendant, Circuit Court Judge Thomas Lynch has reopened the matter and will hold a hearing on the defendant's motion to vacate the judgment.

The defendant is currently released on bail and awaits trial on the CSRA charge. He has filed a Motion to Dismiss the Indictment, alleging that the CSRA is unconstitutional. The defendant's Motion is proper under Fed. R.Crim.P. 12(b), which permits pre-trial motions for issues that can be decided without trial, including defects in the indictment. The Motion to Dismiss is now before this Court.

## LEGAL DISCUSSION

The CSRA states, "[w]hoever willfully fails to pay a past due support obligation with respect to a child who resides in another State shall be punished as provided in subsection (b)." 18 U.S.C. § 228(a). The statute defines "past due support obligation" as "any amount—(A) determined under a court order or an order of an administrative process pursuant to the law of a State to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living; and (B) that has remained unpaid for a period longer than one year, or is greater than $5,000." 18 U.S.C. 228(d)(1). The defendant argues that the CSRA goes beyond the scope of Congress' authority under the Commerce Clause and invades the exclusive province of the states under the Tenth Amendment.

Nine district courts and the Second Circuit have upheld the constitutionality of the CSRA; four district courts have found the CSRA unconstitutional. *Compare United States v. Sage*, 92 F.3d 101 (2d Cir.1996); *United States v. Ganaposki*, 930 F.Supp. 1076 (M.D.Pa.1996); *United States v. Col-*

*lins,* 921 F.Supp. 1028 (W.D.N.Y.1996); *United States v. Nichols,* 928 F.Supp. 302 (S.D.N.Y.1996); *United States v. Kegel,* 916 F.Supp. 1233 (M.D.Fla.1996); *United States v. Bongiorno,* 1996 WL 208508 (D.Mass. 1996); *United States v. Sage,* 906 F.Supp. 84 (D.Conn.1995), *aff'd,* 92 F.3d 101 (2d Cir. 1996); *United States v. Hopper,* 899 F.Supp. 389 (S.D.Ind.1995); *United States v. Murphy,* 893 F.Supp. 614 (W.D.Va.1995); *United States v. Hampshire,* 892 F.Supp. 1327 (D.Kan.1995); *with United States v. Parker,* 911 F.Supp. 830 (E.D.Pa.1995); *United States v. Bailey,* 902 F.Supp. 727 (W.D.Tex. 1995); *United States v. Schroeder,* 894 F.Supp. 360 (D.Ariz.1995), *reconsideration denied,* 912 F.Supp. 1240; *United States v. Mussari,* 894 F.Supp. 1360 (D.Ariz.1995), *reconsideration denied,* 912 F.Supp. 1248.

The courts holding that CSRA is unconstitutional have found that the CSRA does not substantially affect interstate commerce as required under the Commerce Clause, that the CSRA upsets the federal-state balance envisioned by the Constitution and incorporated by the Tenth Amendment, and that federal jurisdiction is inappropriate because of the domestic relations exception and abstention doctrines. I shall consider each of these contentions in turn.

*THE COMMERCE CLAUSE*

Section 8 of Article I of the United States Constitution provides that, "The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Starting with *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), courts have broadly interpreted Congress' power under the Commerce Clause. In fact, the Supreme Court had not invalidated a federal statute as exceeding Congress' authority under the Commerce Clause for over fifty years, until April 1995, when the Court decided *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). *Lopez* involved a challenge to the Gun–Free School Zones Act of 1990, which made it a federal crime to possess a firearm within a school zone. 18 U.S.C. § 922(q). The Court found that Congress had exceeded its power in regulating "a local student at a local school." *Lopez,* at ——, 115 S.Ct. at 1634. The Court pointed out that the Gun–Free School Zones Act did not regulate an economic activity, contained no jurisdictional element requiring an interstate nexus, and had no explicit legislative history delineating its connection to interstate commerce. *Id.,* at —— —— ——, 115 S.Ct. at 1631–32.

In *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), the Supreme Court adopted a two-pronged approach to evaluate whether Congress has exceeded its authority under the Commerce Clause. Accordingly, to evaluate the Constitutionality of the CSRA, this Court must first determine whether a rational basis exists for the conclusion that the regulated activity sufficiently affects interstate commerce. *Id.* at 276, 101 S.Ct. at 2360. If such a rational basis exists, this Court must then decide whether the specific regulation is reasonably adapted to the goals permitted by the Constitution. *Id.* Further, courts must not invalidate Congressional legislation simply because of judicial disagreement with Congress' policy decisions. *FCC v. Beach Comm., Inc.,* 508 U.S. 307, 313–14, 113 S.Ct. 2096, 2101–02, 124 L.Ed.2d 211 (1933). *Lopez* did not overrule, and, in fact, applied this rational basis test. ("[T]he Court has ... undertaken to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce."). —— U.S. at ——, 115 S.Ct. at 1629.

*Lopez* identified three categories of activity that Congress may regulate under the Commerce Clause:

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, ... *i.e.,* those activities that substantially affect interstate commerce.

*Lopez*, at ———-——, 115 S.Ct. at 1629–30 (citations omitted). As the activity regulated by the CSRA is arguably within Congress' Commerce Clause authority under both the first and third categories described in *Lopez*, I shall consider the two separately.

*Channels of Interstate Commerce*

█ The CSRA can be upheld as constitutional because the regulation of child support payments is, in itself, the regulation of the channels of interstate commerce. "The authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained and is no longer open to question." *Caminetti v. United States*, 242 U.S. 470, 491, 37 S.Ct. 192, 197, 61 L.Ed. 442 (1917). "What is regulated [by CSRA] is the payment of a debt from one state and the satisfaction of that debt in another, whether the mechanism used to make this transaction is the United States Mail, an electronic funds transfer, or some other interstate channel." *Nichols*, 928 F.Supp. at 314. The defendant argues that, because the CSRA penalizes the *failure* to make child support payments, the crime could be committed without any use of the channels of interstate commerce. As the Second Circuit explained:

> Such reasoning would mean that Congress would have no power to prohibit a monopoly so complete as to thwart all other interstate commerce in a line of trade. Yet the Sherman Act, 15 U.S.C. §§ 1, 2, is within the Commerce Clause power. To accept [the defendant's] reasoning would disable the United States from punishing under the Hobbs Act, 18 U.S.C. § 1951, making it a crime to "obstruct" interstate commerce, someone who successfully prevented interstate trade by extortion and murder. There would be no trade to obstruct.

*Sage*, 92 F.3d at 105. Under the defendant's reasoning, Congress would be permitted to regulate parents who *underpay* their required child support but not parents who fail to pay their required child support at all. Such an interpretation is unfathomable.

The court in *Parker* found that the CSRA did not regulate commerce because the failure to pay child support was not a commercial transaction:

> Arm's-length commercial actors are not involved in any way. The marketplace for goods and services and prices of commodities are not affected at all. There are no affiliates or cohorts that comprise part of a greater economic network or enterprise.... The activity as issue, therefore, has simply nothing to do with commerce in the context of the limited power given to the federal government and withheld from the states in the Commerce Clause.

*Parker*, 911 F.Supp. at 835. However, Supreme Court precedent does not support the proposition that the Commerce Clause can only implicate voluntary, "arms' length" transactions. *United States v. Bishop*, 66 F.3d 569, 581 (3d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 681, 133 L.Ed.2d 529 (1995). The Supreme Court has held that the regulated activity need not be commercial in character to fall within the accepted bounds of the Commerce Clause. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256, 85 S.Ct. 348, 356, 13 L.Ed.2d 258 (1964). "Not only ... may transactions be commerce though non-commercial; they may be commerce though illegal and sporadic, and though they do not utilize common carriers or concern the flow of anything more tangible than electrons and information." *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 550, 64 S.Ct. 1162, 1172, 88 L.Ed. 1440 (1944) (upholding federal regulation of interstate insurance contracts). For example, the Court upheld a statute criminalizing the transportation of women across state lines for immoral purposes, even though women are not commercial articles of merchandise. *Hoke v. United States*, 227 U.S. 308, 320, 323, 33 S.Ct. 281, 283, 284, 57 L.Ed. 523 (1912). Similarly, for liability to attach under the CSRA, either the debtor parent or the child must have crossed state lines. 18 U.S.C. § 228.

The CSRA essentially penalizes the failure to pay an interstate debt. The First Circuit has held that, "debt collecting ... involves interstate commerce directly...." *National Revenue Corp. v. Violet*, 807 F.2d 285, 288 (1st Cir.1986) (holding that Rhode Island statute governing debt collection violated the dormant Commerce Clause). The CSRA

only applies where there is a court order requiring the transfer of money across state lines to fulfill a child support obligation. Thus, the CSRA clearly involves channels of interstate commerce and is a permissible use of Congress' authority under the Commerce Clause.

*Substantial Effect on Interstate Commerce*

■ Congress' authority under the Commerce Clause to pass the CSRA may also be upheld under *Lopez*'s third category, as an activity substantially affecting interstate commerce.

Unlike the Gun–Free School Zones Act invalidated in *Lopez,* the CSRA includes a specific jurisdictional element. A defendant is criminally liable for failure to pay overdue child support only for a child who resides in a different state. 18 U.S.C. § 228(a). Post–*Lopez* courts have considered the presence of a jurisdictional element to be very important to a Commerce Clause analysis. For example, the First Circuit upheld the constitutionality of a statute prohibiting possession of a firearm with obliterated serial numbers, relying on the statute's specific requirement that the firearm have been transported in interstate or foreign commerce. *United States v. Diaz–Martinez,* 71 F.3d 946, 953 (1st Cir. 1995) (analyzing 18 U.S.C. § 922(k)); *see also United States v. Cardoza,* 914 F.Supp. 683 (D.Mass.1996) (upholding 18 U.S.C. § 922(g), which prohibits felons from possessing firearms that have been transported in interstate commerce); *United States v. Garcia–Beltran,* 890 F.Supp. 67, 72 (D.P.R.1995) (upholding 18 U.S.C. § 2119, which prohibits carjacking vehicles that have been transported in interstate commerce).

■ While the mere presence of a jurisdictional element does not render the statute *per se* constitutional, the jurisdictional element in the CSRA meaningfully demonstrates the regulated activity's nexus with interstate commerce. *Bishop,* 66 F.3d at 585. The CSRA applies only if the defendant live in a different state from the child owed support. Under the statute's requirements, either the defendant or the child must have moved from one state to another. "The passage of a person from one state to another is interstate commerce within the meaning of the Constitution ..." *Simmons v. Zerbst,* 18 F.Supp. 929, 930 (N.D.Ga.1937) (upholding constitutionality of Fugitive Felony Act). Moreover, the CSRA's jurisdictional element necessitates that a defendant's compliance with the child support order in question would involve the transfer of money from one state to another.

The *Lopez* Court points out that Congress made no express findings regarding the effects of gun possession in school zones on interstate commerce when passing the Gun–Free School Zone Act. —— U.S. at ——, 115 S.Ct. at 1631. While acknowledging that Congress need not make such formal findings, the Court states that "congressional findings would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial· effect was visible to the naked eye...." *Id.,* at ——, 115 S.Ct. at 1632. The existence of explicit legislative findings of a nexus between the regulated activity and interstate commerce can establish the constitutionality of statute even without jurisdictional elements. *See, e.g., United States v. Kremetis,* 903 F.Supp. 250, 251–52 (D.N.H.1995) (upholding 21 U.S.C. § 841(a)(1), possession of cocaine with intent to distribute).

Congress made specific factual findings in the legislative history of the CSRA which demonstrate the statute's nexus with interstate commerce. According to the House Report on the CSRA, 32% of families with an absent father live below the official poverty line. H.R.Rep. 771, 102d Cong., 2d Sess. (1992). Congress determined that every year more than $5 billion in child support goes unpaid, at least 40% of which is owed by parents living in different states from their children. 138 Cong.Rec. H7325 (statement of Rep. Schumer); 140 Cong.Rec. S9430 (statement of Sen. Kohl). Despite the Uniform Reciprocal Enforcement of Support Act, which was·intended to facilitate interstate enforcement of child support orders, one Congressperson cited a study finding that only 41% of state courts actually enforce other states' support orders. 138 Cong.Rec. H7326 (statement of Rep. Hyde). Another Representative stated that, "the ability of

those States to enforce such laws outside their own boundaries is hobbled by a labyrinth of extradition laws and snarls of red tape." 138 Cong.Rec. H7325 (statement of Rep. Schumer). The House Report on the CSRA stated that:

> approximately one-third of child support cases concern children whose fathers live in a different state and, thus, require interstate collection. According to that [GAO] report, fifty-seven percent of the custodial parents in interstate cases reported receiving child support payments only occasionally, seldom, or never. Although there are many reasons for which a parent may fail to make a child support payment, research in this area reveals that a significant number of the parents who fail to pay do so intentionally. The statistics above suggest that their chances for successfully avoiding such payments increase markedly when they cross state lines.

H.R.Rep. No. 771, 102d Cong., 2d Sess. (1992). Congress also connected the nonpayment of child support to the accompanying need for federal public assistance, such as Aid to Families with Dependent Children and Medicaid. 138 Cong.Rec. H7325 (statement of Rep. Schumer). Thus, in numerous ways, the CSRA's legislative history demonstrates that the failure to pay interstate child support orders is an activity that Congress can regulate within its Commerce Clause authority. The Commerce Clause was intended to allow Congress to regulate interaction between different states and their citizens, which otherwise might lead to disputes over which state's law governs. *See, e.g., New York v. United States,* 505 U.S. 144, 180, 112 S.Ct. 2408, 2430, 120 L.Ed.2d 120 (1992). Precisely because states are independent sovereigns and cannot intrude on each other's sovereignty, federal action is necessary to ensure that interstate debtor parents comply with state support orders.

In *Lopez,* the government relied upon attenuated arguments to connect gun possession in school zones with interstate commerce. First, the government argued that gun possession can result in violent crime, and violent crime is costly to victims and, through insurance, to all citizens. *Lopez,* ——

U.S. at ——, 115 S.Ct. at 1632. The Court responded that, under such "costs of crime" reasoning, any activity that might lead to violent crime could be federally regulated, no matter how tenuously related to interstate commerce. *Id.* Second, the government argued that the presence of guns in schools poses a threat to the educational process, which leads to less productive citizenry and, eventually, a downturn in the nation's economy. *Id.* The Court found that this "national productivity" argument would allow Congress to regulate any activity that could conceivably affect an individual's economic productivity. Together, the "cost of crime" and "national productivity" arguments would, in essence, allow federal regulation of *any* activity.

In contrast, the CSRA's connection to interstate commerce is far more direct. As discussed above, the failure to pay child support is itself an interstate economic activity, involving an obligation to transfer money from a person in one state to a person in a different state. "The non-custodial parent reaps an economic gain each time a support payment is withheld, while the offspring suffers an economic loss." *Sage,* 906 F.Supp. at 90.

While the *Lopez* court viewed *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), as "perhaps the most far reaching example of Commerce Clause authority over intrastate activity," it did not overrule *Wickard.* —— U.S. at ——, 115 S.Ct. at 1630. In *Wickard,* a farmer was penalized for harvesting more wheat than he was allotted under the federal Agricultural Adjustment Act. 317 U.S. at 114–15, 63 S.Ct. at 83–84. Even though the Act regulated wheat that could be grown for home consumption, the Court found that the amount of wheat produced for home consumption, when considering all the farmers who grow their own wheat in the aggregate, could affect national wheat prices. *Id.* at 118–19, 127–28, 63 S.Ct. at 85–86, 90–91. *Wickard* stands for the proposition that courts must look to the consequences of the regulated activity by all relevant people in order to determine whether the activity substantially affects interstate commerce. In the present case, if all parents owing inter-

state child support refused to pay, at least one-third of all children entitled to support would not receive the money, according to 1989 statistics, leading to a total deficit of more than $5 billion. H.R.Rep. No. 771, 102d Cong., 2d Sess. (1992). As the court in *Kegel* stated, "if it is appropriate for Congress to regulate individual activity to assure that the market price of wheat will remain high, it is no less appropriate that Congress regulate individuals to assure that the standard of living of the custodial parent and child are not devastated, to the end that interstate commerce, in its broadest sense is substantially impacted." 916 F.Supp. at 1238–39.

Unlike the law struck down in *Lopez*, the CSRA contains a jurisdiction requirement, has legislative history explaining its connection to interstate commerce, and relies on a direct causal connection between the activity regulated and its substantial effects on interstate commerce. For these reasons, I find that the activity regulated in the CSRA, failure to pay an interstate child support obligation, substantially affects interstate commerce.

*THE TENTH AMENDMENT*

The Tenth Amendment to the Constitution provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Traditionally, courts have taken one of two approaches in evaluating whether Congressional action impermissibly invades state sovereignty under the Tenth Amendment. The first approach provides that rights under the Tenth Amendment are coextensive with limits to Congress' authority under its enumerated powers. *See United States v. Lerebours*, 87 F.3d 582, 585 (1st Cir.1996). The second approach considers whether a federal statute improperly invades state sovereignty. *See Koog v. United States*, 79 F.3d 452 (5th Cir.1996). The defendant advocates the second approach, interpreting the Tenth Amendment as preserving a core of state sovereignty, which Congress and the federal courts cannot invade. However, the two approaches can be reconciled through a careful analysis of Supreme Court decisions on Tenth Amendment challenges to Congressional legislation.

In *Garcia v. San Antonio Metro. Trans. Auth.*, the Court appeared to adopt the first approach to the Tenth Amendment's limitation on Congressional action, defining state sovereignty as only that authority beyond Congress' enumerated power. 469 U.S. 528, 549, 105 S.Ct. 1005, 1016, 83 L.Ed.2d 1016 (1985). The Court held that the states retain sovereign authority "only to the extent that the Constitution has not divested them of their original powers and transferred these powers to the federal government." *Id.* The Court quoted James Madison's statement to the Members of the First Congress: "Interference with the power of the States was no constitutional criterion of the power of Congress. If the power was not given, Congress could not exercise it; if given, they might exercise it, although it should interfere with the laws, or even the Constitution of the States." *Id.* Thus, under the Court's approach in *Garcia*, CSRA is immune from a Tenth Amendment challenge because Congress passed CSRA under enumerated legislative powers, specifically, the Commerce Clause.

*Garcia*, however, was not the Supreme Court's last word on the Tenth Amendment. In 1992, the Court invalidated a federal statute which gave states a choice between enacting certain regulations or assuming ownership of radioactive waste. *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). In *New York*, as in *Garcia*, the Court explained that the Tenth Amendment limits Congressional action by requiring Congress to act only within its enumerated powers. But the *New York* Court went on to state that:

> The Tenth Amendment ... restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself, which, as we have discussed is essentially a tautology. Instead, the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States.

*Id.* at 157, 112 S.Ct. at 2418. This passage suggests that the Supreme Court was adopt-

ing the second approach to the Tenth Amendment, namely that the Tenth Amendment preserves a core of state sovereignty which Congress and the federal courts cannot invade.

Nonetheless, the Court in *New York* declined to adopt one approach over another:

> In the end, just as a cup may be half empty or half full, it makes no difference whether one views the question at issue in this case as one ascertaining the limits of power delegated to the Federal Government under the affirmative provisions of the Constitution or one of discerning the core of sovereignty retained by the States under the Tenth Amendment. Either way, we must determine whether any of the three challenged provisions of the Low–Level Radioactive Waste Policy Amendments Act of 1985 oversteps the boundary between federal and state authority.

*Id.* at 159, 112 S.Ct. at 2419.

■ The *New York* Court's decision, read in full, reconciles the two different approaches because it requires that courts not only determine if the Constitution confers on Congress the raw power to regulate a certain activity, but also requires courts to evaluate whether Congress' chosen method of regulation impermissibly invades state sovereignty. In *New York*, the Court stated that Congress undoubtedly had the raw power to regulate disposal of low level nuclear waste. "Regulation of the ... interstate market in waste disposal is therefore well within Congress' authority under the Commerce Clause." *Id.* at 160, 112 S.Ct. at 2420. Nonetheless, the Court found that Congress' chosen *method* of regulation impermissibly invaded upon state sovereignty because the take-title provisions of the Low–Level Radioactive Waste Policy Amendments Act of 1985 essentially amounted to Congress directing the states to enact regulations regarding the disposal of nuclear waste. *Id.* at 188, 112 S.Ct. at 2434. According to the Court, "[The Constitution] simply does not give Congress the authority to require the States to regulate." *Id.* at 178, 112 S.Ct. at 2429.

Thus, the *New York* Court requires that, in evaluating Tenth Amendment limits on Congressional legislation, courts examine the

method by which Congress chooses to regulate a particular activity in addition to whether Congress has the raw power to regulate the activity. The method of regulation required by the *New York* Court is analogous to the often-neglected second prong of the Commerce Clause analytical framework, the determination as to whether the specific regulation is reasonably adapted to the goals permitted by the Constitution. *Hodel*, 452 U.S. at 276, 101 S.Ct. at 2360. In determining whether the method of Congressional regulation is reasonably adapted to the ends permitted by the Constitution, courts should consider the federal-state balance envisioned by the Constitution, particularly the Tenth Amendment. Although a federal statute may substantially affect interstate commerce, the statute may still be unconstitutional if the method of regulation unduly invades state sovereignty, as embodied in the Constitution.

In sum, a proper analysis of the Tenth Amendment's limits on Congressional power requires courts to examine not only whether Congress has the raw power to regulate, but also whether Congress' chosen method of regulation interferes with state sovereignty. *See also ACORN v. Edwards*, 81 F.3d 1387, 1393 (5th Cir.1996) (holding that courts must determine both whether Congress has the power to regulate the activity and whether the method of regulation chosen invades state sovereignty). Having already concluded that the Commerce Clause confers on Congress the power to enact CSRA, I must now discuss the method of regulation Congress has chosen.

*Federal Relitigation of Issues Decided by State Courts*

■ The defendant argues that the method of regulation embodied in the CSRA, by allowing review of state court orders, upsets the federal-state balance set forth in the Constitution. Several district courts which have found the CSRA unconstitutional have based their decision, in part, upon the necessity for federal courts to review state court child support orders. The court in *Schroeder* stated,

> [A]ctual application of the CSRA would force federal courts to review and apply

orders of state courts in violation of principles of federalism and comity. A defendant being prosecuted under the CSRA could arguably defend the action by challenging the validity of the underlying state court support order. Either the federal court would be forced to review the support order, or stay the pending federal criminal case while the support order is collaterally attacked in state court. Neither of these scenarios is desirable in light of the principles of comity and the speedy trial provisions federal courts are bound by in criminal matters.

*Schroeder,* 894 F.Supp. at 368; *see also Bailey,* 902 F.Supp. at 729. Most courts upholding the CSRA have not responded to this argument because, in general, defendants have not raised serious challenges to the validity of the underlying state court orders. To the extent that courts have addressed this question, they generally have presumed that the CSRA requires no review of state court orders. *Ganaposki,* 930 F.Supp. at 1083 ("[T]he CSRA goes no further than the enforcement of state court decrees and is not an attempt by Congress to legislate with respect to the amount of child support payment in any particular case; any ruling that support must be paid and the amount to be paid is left to the states."). In *Collins,* the defendant had filed a motion to modify the state child support order, which was pending at the time of his indictment under the CSRA. 921 F.Supp. at 1033. The court found that, under California law, a modification of a child support order would be retroactive only to the date of the motion to modify and thus would not affect the past due support at issue in the criminal prosecution. *Id.* at 1033, n. 4.

In the present case, the defendant claims that he received no notice of the state court proceedings which resulted in the child support order. The defendant alleges that he is not the biological father of the child awarded support. He also was not present when the court decided the amount of child support that he would be able to pay. Therefore, the defendant has put directly at issue the validity of the underlying state court support order. I must first determine whether the statutory language of the CSRA actually per-

mits the relitigation of issues decided by the state court.

*Statutory Construction*

■ The government argues that the Court may not look beyond the "four corners" of the state child support order and that the defendant may not collaterally challenge the merits of that order. The CSRA criminalizes the failure to pay a child support obligation, as determined by an administrative or court order. A cursory reading of 18 U.S.C. § 228 leaves unclear whether a defendant can be convicted for failure to pay *any* child support order or whether the order must be valid and meritorious. When a statute is facially ambiguous, its intended meaning can often be best discerned from its legislative history. *United States ex rel. S. Prawer & Co. v. Fleet Bank of Maine,* 24 F.3d 320, 327 (1st Cir.1994). I quote at great length from the legislative history of the CSRA, as it proves quite instructive on this issue:

The operative language establishing the requisite intent under [the CSRA] is "willfully fails to pay." This language has been borrowed from the tax statutes that make willful failure to collect or pay taxes a Federal crime, 26 U.S.C. §§ 7202, 7203. Thus, the willful failure standard of [the CSRA] should be interpreted in the same manner that Federal courts have interpreted these felony tax provisions. In order to establish willfulness under those provisions, the government must establish, beyond a reasonable doubt, that at the time payment was due the taxpayer possessed sufficient funds to enable him to meet his obligation or that the lack of sufficient funds on such date was created by (or was the result of) a voluntary and intentional act without justification in view of all of the financial circumstances of the taxpayer. *U.S. v. Poll,* 521 F.2d 329, 333 (9th Cir.1975). The willfulness element in the tax felony statutes requires proof of an intentional violation of a known legal duty, and thus describes a specific intent crime. *U.S. v. Birkenstock,* 823 F.2d 1026, 1028 (7th Cir.1987). The word "willfully" under the tax felony statutes imports a bad purpose or evil motive. *U.S. v. Bishop,* 412

U.S. 346, 361, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941 (1973). The Committee intends that the willful failure standard of [the CSRA] be given similar effect as the willful failure standard contained in these tax felony provisions.

H.R.Rep. No. 771, 102d Cong., 2d Sess. (1992); *see also* 138 Cong.Rec. S17131. Thus, Congress clearly intended that defendants be allowed to offer inability to pay and lack of notice of legal duty as defenses to a CSRA prosecution, even though those issues would presumably have been resolved in state court proceedings.

Another basis for admissibility of evidence relating to the merits of the original support order can be found in the statute's definition that a past due support obligation must have been "determined under a court order or an order of an administrative process *pursuant to the law of a State....*" 18 U.S.C. § 228(d)(1)(A). Although courts have not interpreted this phrase of the CSRA, the Supreme Court has discussed analogous language. In considering whether a defendant charged with reentry after deportation could challenge the merits of the underlying deportation proceedings, the Supreme Court distinguished the current reentry statute from the prior, superseded criminal statute based solely on their statutory language. *United States v. Mendoza–Lopez*, 481 U.S. 828, 836, 107 S.Ct. 2148, 2154, 95 L.Ed.2d 772 (1987). The Court stated:

> Congress thus had available to it in at least one of the predecessor sections— § 180(a)—express language that would have permitted collateral challenges to the validity of deportation proceedings in a criminal prosecution for reentry after deportation. It nonetheless failed to include in § 1326 the "in pursuance of law" language of § 180(a).

*Id.* The prior reentry after deportation language, "in pursuance of law," is almost identical to the CSRA's "pursuant to the law of a State." Both clauses clearly imply that the underlying proceeding must have been lawful in order for federal criminal sanctions to attach.

If the CSRA did not permit any review of state court support orders, convictions under

the CSRA might violate the Due Process Clause of the Fifth Amendment. The Supreme Court found that imposing criminal sanctions for reentry after deportation violated the Due Process Clause where direct judicial review of original deportation was, in effect, denied. *Id.* at 837, 107 S.Ct. at 2154. The Court held that, "Our cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding." *Id.* at 837–38, 107 S.Ct. at 2154–55; *see also United States v. Joseph*, 833 F.Supp. 904, 905 (S.D.Fla.1993) (finding that admission of state court conviction based on constitutionally invalid plea in federal prosecution for reentry after deportation would violate Due Process Clause). In one of the first CSRA prosecutions, the federal court considered the merits of the defendant's arguments that his state court divorce decree was obtained in violation of the Due Process Clause and the Soldiers and Sailors Civil Relief Act. *Hampshire*, 892 F.Supp. at 1331–33. The defendant stated that, since he was an AWOL soldier in the custody of the county jail, he had no meaningful opportunity to be heard or to appeal his divorce action. *Id.* at 1331. The court found that the defendant had not alleged facts sufficient to establish a due process violation and that judgments rendered in violation of the Soldiers and Sailors Relief Act were only voidable, not void. *Id.* at 1332; *see also Collins*, 921 F.Supp. at 1032, n. 3 ("If, in a case involving an administrative child support ruling, a defendant [charged under the CSRA] were to move to suppress evidence of the existence of [an] administrative support ruling on the ground that it was obtained in violation of his right to due process, the court may be obliged to conduct a hearing to determine this issue."). Based on this analysis, I conclude that the CSRA does allow relitigation of the merits of the underlying state court order.

*State Sovereignty*

 Since the CSRA must be construed to encompass relitigation of issues that may have been decided by the state court, I must now determine whether such

relitigation violates the notion of a federal-state balance, as conceived under the Constitution. In considering the connection between the state court custody decree and criminal prosecution under the CSRA, we must first look to the doctrine of collateral estoppel. Under the full faith and credit statute, 28 U.S.C. § 1738, federal courts must give state court judgments the collateral estoppel effect that another court of that state would give. *Parsons Steel, Inc. v. First Alabama Bank,* 474 U.S. 518, 523, 106 S.Ct. 768, 771, 88 L.Ed.2d 877 (1986); *Isaac v. Schwartz,* 706 F.2d 15 (1st Cir.1983). Florida law recognizes collateral estoppel when the issue of fact was actually litigated, between the same parties, and decided in a valid and final judgment. *Department of Health & Rehab. Serv. v. B.J.M.,* 656 So.2d 906, 910 (Fla.1995). However, collateral estoppel does not apply when a more lenient burden of proof was used in the first proceeding than in the second. *See, e.g., Stevenson v. Chicago,* 638 F.Supp. 136, 140 (N.D.Ill. 1986). In the present case, the issues resolved by the state court in issuing its child support order were decided by a preponderance of the evidence. *See Department of Health & Rehab. Serv. v. Moore,* 603 So.2d 13, 14 (Fla.Dist.Ct.App.1992). However, in order to convict the defendant under the CSRA, the government must prove every element, including the defendant's willfulness, beyond a reasonable doubt. Thus, issues decided against the defendant in the state court judgment must be relitigated because the government needs to prove them beyond a reasonable doubt, rather than by a preponderance of the evidence.

 The dual sovereignty doctrine permits successive state and federal prosecutions for the same act, because each sovereign has a strong interest in prosecuting its own offenses without interference. *Heath v. Alabama,* 474 U.S. 82, 89, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985). "When a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences.'" *Id.* at 88, 106 S.Ct. at 437 (citing *United States v. Lanza,* 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922)). Similarly, "state court [evidentiary] rulings in a

criminal trial are not binding on a federal court. This follows from the basic notion that in our federal system state and national sovereignty are separate and distinct from one another, and each political entity has power to determine what are offenses against it and to try and punish such offenses independently." *United States v. Miller,* 14 F.3d 761, 763 (2d Cir.1994).

The Armed Career Criminal Act, which significantly enhances sentences for firearm possession based on prior convictions, is one of the most common situations in which federal courts in criminal proceedings consider state court judgments. 18 U.S.C. § 924(e). The Supreme Court has held that defendants may collaterally challenge their previous state court convictions only on the basis that they were denied their right to counsel under *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). *Custis v. United States,* 511 U.S. 485, ——, 114 S.Ct. 1732, 1738, 128 L.Ed.2d 517 (1994). Courts have also used as sentence enhancers state court convictions that were nonfinal due to pending challenges. *Clawson v. United States,* 52 F.3d 806 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 252, 133 L.Ed.2d 177 (1995); *United States v. Acosta,* 861 F.Supp. 1 (D.R.I.1994), *aff'd* 67 F.3d 334 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 965, 133 L.Ed.2d 887 (1996). The Court's prohibition in *Custis* on almost all collateral attacks of state court convictions was based upon statutory construction of the Armed Career Criminal Act, *not* upon Tenth Amendment or federalism concerns. *Custis,* 511 U.S. at —— ——, 114 S.Ct. at 1735–37; *cf. Lewis v. United States,* 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980) (holding, based on statutory interpretation, that conviction for being a felon with a firearm could be predicated on prior uncounseled felony conviction). In the present case, statutory construction of the CSRA, unlike the Armed Career Criminal Act, clearly indicates that many of the issues decided in the state court support order must be relitigated in this criminal prosecution.

Nonetheless, federal prosecution under the CSRA does not undermine the state court's child support order. The federal court's decision concerns only the defendant's criminal

liability, not the continued applicability of the state court's support order. This situation is completely different from a federal court enjoining a state court action. *See Parsons Steel,* 474 U.S. at 525, 106 S.Ct. at 772. Even if the government fails to prove beyond a reasonable doubt that the defendant willfully failed to pay his child support, the state may continue to seek child support from him. Any decision in federal court, even a finding that the defendant was unable to pay the support ordered or was not the child's father, would not be binding on the state court enforcing its support order, in part because different burdens of proof are involved in the two proceedings. *Stevenson,* 638 F.Supp. at 140. The ability of a federal court to consider the merits of the child support award stems from the very federalism that the defendant proclaims. Because the state and federal governments are separate sovereigns, they may each pursue the prosecutions of violations of their own laws in the manner that they see fit. Likewise, a federal court's ruling on § 1983 civil rights action would not be binding on a state court's criminal prosecution, in order to protect that state's sovereignty, as recognized by the Tenth Amendment.

A similar question was presented to the Ninth Circuit in *Sharifzadeh v. INS,* 24 F.3d 249 (Table), 1994 WL 140652 (9th Cir.1994). The defendant's immigration visa was based on a second marriage to a United States citizen, but he was still legally married to his first wife at the time of entry. *Id.* After entry, the defendant obtained an annulment of his first marriage. *Id.* Subsequently, the Board of Immigration Appeals (BIA) found the defendant to be excludable at entry because his second marriage had been invalid at that time. *Id.* The defendant argued that BIA's failure to give his annulment retroactive effect violated the Tenth Amendment and the Full Faith and Credit Clause. *Id.* The Ninth Circuit held, "Deciding that Fahraji was excludable at entry does not undermine the annulment decree, or have any bearing on the validity of the annulment or Hawaii's authority to grant the decree." *Id.* at **1. Likewise, relitigation of some of the issues addressed in a state court order solely for the purpose of a criminal prosecution in no way undermines the validity of that state court order.

Congress is not forging new ground by requiring litigation of an underlying state law issue in a CSRA prosecution. Since 1934, it has been a federal crime to cross state lines to avoid prosecution of a state felony. 18 U.S.C. § 1073. As part of a federal prosecution under 18 U.S.C. § 1073, the defendant's violation of state criminal law must be proven:

> Before a conviction could be had under the [federal] statute, the burden would rest on the United States to establish beyond a reasonable doubt that the defendant had committed in some one of the states or territories the offense denounced in the statute, and that he was subject to prosecution in the state where the offense was committed and had fled therefrom to avoid prosecution.

*United States v. Miller,* 17 F.Supp. 65 (W.D.Ky.1936); *see also Lupino v. United States,* 185 F.Supp. 363, 367 (D.Minn.1960) (holding that one element of a violation under § 1073 is that the defendant actually committed the underlying state offense). A federal prosecution under 18 U.S.C. § 1073 is independent of any actual state prosecution of the underlying state law crime. *Lupino,* 185 F.Supp. at 367.

According to its legislative history, the CSRA's goal "is to strengthen, not to supplant, State enforcement efforts." 138 Cong. Rec. H7326 (statement of Rep. Hyde). The CSRA is intended to protect state court judgments. Because of cumbersome bureaucracies, states often fail to enforce other states' child support orders. Congress decided to add a criminal penalty to discourage parents from taking advantage of this lack of enforcement of other states' orders. The litigation of the defendant's ability to pay and knowledge of his legal duty are intended only to insure that criminal penalties do not attach for actions which were not "willful." If a federal prosecution of an act already subject to state prosecution is allowed, surely the lesser invasion of federal relitigation, only for federal purposes, of some issues

decided by a state court in a civil case must also be permitted.

I find that relitigation in a CSRA prosecution of issues decided by the state court does not invade state sovereignty under the Constitution, as formalized by the Tenth Amendment. Thus, the CSRA is reasonably adapted to the goals permitted by the Constitution, and its enactment was within the powers of Congress under the Commerce Clause.

## DOMESTIC RELATIONS EXCEPTION

One traditional area of state judicial sovereignty is in the issuance of divorce, alimony, and child custody decrees. *Ankenbrandt v. Richards,* 504 U.S. 689, 703, 112 S.Ct. 2206, 2214, 119 L.Ed.2d 468 (1992); *Barber v. Barber,* 21 How. 582, 16 L.Ed. 226 (1859). Despite the lack of explicit constitutional authority for such an exception, federal courts have long refused to exercise jurisdiction over such "domestic relations" matters. *Ankenbrandt,* 504 U.S. at 696–97, 112 S.Ct. at 2211–12. Federal courts believe that state courts are uniquely qualified to decide divorce, alimony, and child custody disputes, as such cases often involve retention of jurisdiction for considerable periods, use of social workers and state protection agencies, and considerable expertise in family law. *Id.* at 703–04, 112 S.Ct. at 2214–15.

Some courts have found that the CSRA runs afoul of the domestic relations exception to federal jurisdiction. *Bailey,* 902 F.Supp. at 729. I disagree. First, the Supreme Court has specifically held that the domestic relations exception applies to federal diversity jurisdiction under 28 U.S.C. § 1332. *Ankenbrandt,* 504 U.S. at 700–01, 112 S.Ct. at 2213–14; *Rubin v. Smith,* 817 F.Supp. 987, 990 (D.N.H.1993). However, the present case arises under the CSRA, a federal criminal law, and thus this Court has federal question jurisdiction under 28 U.S.C. § 1331.

Second, cases under the CSRA do not involve the issuance of a divorce, alimony, or child custody decree. The mere fact that the present case is related to a child support award is not sufficient to warrant the use of the domestic relations exception. Courts have found the domestic relations exception inapplicable in a suit for fraudulent concealment of marital assets during a state divorce proceeding; *Strasen v. Strasen,* 897 F.Supp. 1179, 1182 (E.D.Wis.1995); in a § 1983 action against the plaintiff's ex-husband and the police for assuming physical custody of their child without notice; *Rubin,* 817 F.Supp. at 991; and in a diversity suit for tortious interference with custody of a child; *Minot v. Eckardt–Minot,* 13 F.3d 590, 592 (2nd Cir. 1994) (upholding the district court's decision to abstain, however). All of these cases were obviously related to underlying divorce or child custody proceedings in state court. However, such connections, like the relation of a CSRA criminal prosecution to the underlying child support order which the defendant allegedly failed to pay, are insufficient to warrant a domestic relations exception to federal courts' otherwise proper jurisdiction.

## ABSTENTION

Arguably, this Court should decline jurisdiction over this case and allow the Florida court to decide the defendant's Motion to Vacate its Judgement before proceeding with this federal prosecution. The defendant has previously made a motion to stay these proceedings until the state court has resolved his pending motion. However, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). Federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given to them." *Id.* at 817, 96 S.Ct. at 1246. Four different types of abstention potentially could apply to this case: (1) *Burford;* (2) *Colorado River;* (3) *Younger;* (4) *Rooker–Feldman.* Keeping in mind the general rule against abstention, I will address each one in turn.

*Burford* abstention was named for *Burford v. Sun Oil Co.,* where the Supreme Court declined federal jurisdiction in a suit to enjoin the decision of a state railroad commission, an agency in a complex state regulatory system devised for the conservation of oil and gas in the state. 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). As the Supreme Court has since explained,

Where timely and adequate state-court review is available, a federal court [should abstain]: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar;" or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Public Service Inc. v. Council of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989) (citations omitted). The Supreme Court has raised the possibility that *Burford* abstention might be appropriate in cases relating to family law, but only if the cases presented complex issues of state law that the state courts would best decide. *Ankenbrandt,* 504 U.S. at 705–06, 112 S.Ct. at 2215–16. The Second Circuit did uphold a district court's *Burford* abstention in a tort suit for custodial interference. *Minot v. Eckardt–Minot,* 13 F.3d 590 (2d Cir.1994). However the Second Circuit based its decision on the new and unsettled nature of this tort, which would therefore raise difficult questions of state law in the case. *Id.* at 593–94. The court stated that, "Even though this area of the law is ill-suited to federal court determinations, the family-law nature of the subject matter would not alone justify abstention in this case." *Id.* at 594. Another court found *Burford* abstention inapplicable in a suit for fraud during divorce proceedings because "[a]t its heart, this case is about fraud, not family law," and because the cases presented no complex questions of state law that would interfere with the state's system for addressing family disputes. *Strasen,* 897 F.Supp. at 1185. As discussed above, at its heart, the CSRA is a criminal law for failure to pay a debt, not a family law suit.

▮ Although the general rule is that a pending state action does not bar a federal court from considering the same matter, under *Colorado River Water Conser. Dist. v. United States,* federal courts may abstain because of pending state suits in exceptional circumstances when necessary for "wise judicial administration." 424 U.S. 800, 817–18,

96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). As *Colorado River* abstention has been interpreted, courts may weigh such factors as which court assumed jurisdiction first, whether either court assumed jurisdiction over property, the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, the presence of federal law issues, and the adequacy of the state court proceeding to protect the parties' rights. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 19–28, 103 S.Ct. 927, 938–44, 74 L.Ed.2d 765 (1983). However, courts have frequently emphasized that *Colorado River* abstention is only appropriate in very unusual, exceptional situations. *Elmendorf Grafica Inc. v. D.S. Amer. (East) Inc.,* 48 F.3d 46, 50 (1st Cir.1995). In this case, the defendant has filed a motion to vacate the Florida court's child support order. The Florida court has reopened the case to hold a hearing on this motion. Arguably, therefore, a state court proceeding is currently pending. However, an analysis of the *Colorado River* factors indicates that the present case does not present exceptional circumstances warranting abstention. This Court had jurisdiction prior to the reopening of the state court proceedings. The defendant petitioned to reopen the state court case in November 1995, several months after his criminal indictment in this case. This Court's jurisdiction is not inconvenient and is the appropriate jurisdiction for prosecutions of federal crimes. Most importantly, under the CSRA, the defendant's legal duty and ability to pay must be proven beyond a reasonable doubt, with the safeguards attendant to a criminal trial. If this Court deferred to the Florida court's judgment, the defendant's rights would not be adequately protected, nor would substantive questions of federal law be decided. In light of all these factors, I find abstention under *Colorado River* inappropriate.

▮ In *Younger v. Harris,* the Supreme Court held that our country's system of federalism prohibits federal courts from enjoining pending state criminal prosecutions. 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *Younger* has been extended to encompass pending civil actions in state

court, where the civil statute is in aid of and closely related to criminal statutes. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975). In *Moore v. Sims*, the Supreme Court ruled that the lower federal court should have abstained, where the plaintiffs were challenging the constitutionality of state custody law and seeking an injunction of concurrent state family court proceedings. 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979). *Younger* abstention is not warranted where the federal court's decision will "not enjoin or interfere with any state proceeding [that is] pending." *Rivera–Puig v. Garcia–Rosario*, 983 F.2d 311, 319 (1st Cir.1992). Where the federal action is merely related to issues involved in a pending state family court proceeding, abstention is not necessary. *Rubin*, 817 F.Supp. at 992. In the present case, the defendant's prosecution under the CSRA will in no way enjoin or interfere with the state court's enforcement of its own decree.

 The final type of abstention that arguably could be applicable in this case stems from the *Rooker–Feldman* doctrine. Under the *Rooker–Feldman* doctrine, federal district courts cannot entertain challenges to state court orders, even when those orders violate federal law. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). In *District of Columbia Ct. of Appeals v. Feldman*, the Supreme Court held that a D.C. bar applicant who was denied a waiver for a bar admission requirement could not challenge that decision in federal district court. 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). The Court stated that only the Supreme Court can review final determinations of state courts, including the District of Columbia Court of Appeals, under 28 U.S.C. § 1257. *Id.* at 476, 103 S.Ct. at 1311. District courts are not supposed to entertain arguments which are inextricably intertwined and inseparable from state court judgments. *Id.* at 483 n. 16, 103 S.Ct. at 1315 n. 16. One court held that the *Rooker–Feldman* doctrine was not applicable when the state court had not fully adjudicated the issue before the federal court and where decision on those issues would not require appellate-style review of the state court. *Strasen*, 897 F.Supp. at 1183. In the present

case, the current federal prosecution is clearly separable from the Florida court's paternity and child support order. This Court will not review the state court's order for errors but, rather, will allow the defendant to present defenses relating to issues which could have been decided in the previous state court case. In addition, the defendant's paternity apparently was decided in the Florida court without the defendant's presence, and thus the defendant's legal duty to the child and his ability to pay were not "fully adjudicated." This relitigation of issues does not constitute "appellate-style review." Therefore, I find that the *Rooker–Feldman* doctrine does not apply.

Moreover, the applicability of all of these types of abstention to federal criminal prosecutions is unclear. Very few courts have used abstention doctrines in criminal cases. Although the parties have agreed that the Speedy Trial Act is not applicable to the present case, I would certainly have concerns about undue delay incumbent in waiting for the resolution, and perhaps appellate review, of the state court case. Even if the state court decided the defendant's legal duty to pay support and his financial condition, these issues will not be proven beyond a reasonable doubt, as required by the legislative history of the CSRA. H.R.Rep. No. 771, 102d Cong., 2d Sess. (1992). Thus, staying this prosecution to wait for the state court's decision about whether to vacate its original judgment will not even prevent relitigation of these issues. In reviewing a lower court's decision to refer primary jurisdiction to a federal agency, the Ninth Circuit stated, "Our concern with the district court's stay and referral is heightened by the fact that this action is a criminal prosecution.... Requiring the government to litigate issues central to a criminal prosecution in collateral agency proceedings is at odds with the general rule of prosecutorial discretion over the bringing of criminal indictments." *United States v. General Dynamics Corp.*, 828 F.2d 1356, 1366 (9th Cir.1987); *see also United States v. Woodard*, 376 F.2d 136 (7th Cir. 1967) (concurrence) (stating that if it were not a criminal case, abstention would be appropriate so that the state courts could inter-

pret their own laws). In sum, I find that this Court has jurisdiction over the present case and that abstention would be inappropriate.

### CONCLUSION

For the reasons discussed above, I find that the CSRA does not exceed Congress' authority under the Commerce Clause and that the CSRA does not encroach on state sovereignty, as embodied in the Tenth Amendment. Furthermore, federal jurisdiction over this case is proper, as neither the domestic relations exception nor the abstention doctrines are applicable. The defendant's Motion to Dismiss the Indictment is therefore denied.

SO ORDERED.